**In re FTC CORPORATE PATTERNS REPORT LITIGATION.**

**In re FTC LINE OF BUSINESS REPORT LITIGATION.**

Misc. Nos. 76–0126, 76–0127.

United States District Court, District of Columbia.

April 12, 1977.

---

49. F.R.Civ.P. 8(a).

Edwart T. Tait, Lee A. Rau, John M. Wood, Stuart M. Gerson and Thomas H. Reilly of Reed, Smith, Shaw & McClay, Washington, D. C., for American Air Filter Co., Inc., et al.

Ira M. Millstein, Mark A. Jacoby and Salem M. Katsh of Weil, Gotshal & Manges, New York City, for Chamber of Commerce of the U. S., et al.

John F. McClatchey and Leslie W. Jacobs of Thompson, Hine & Flory, Cleveland, Ohio, for Goodyear Tire & Rubber Co., Hobart Corp. and Van Dorn Co.

J. Randolph Wilson, John S. Koch, Steven S. Rosenthal, and Philip C. Stahl of Covington & Burling, Washington, D. C., for Chamber of Commerce of the U. S., et al.

Richard W. Pogue of Jones, Day, Reavis & Pogue, Cleveland, Ohio, and Mark Elliot Mazo and John C. Reitz of Jones, Day, Reavis & Pogue, Washington, D. C., for American Greetings Corp., et al.

Robert E. Jordan, III, Robert M. Goolrick and Michael K. Wyatt of Steptoe & Johnson, Washington, D. C., and Edward E. Vaill and Michael J. Myers, Los Angeles, Cal., for Atlantic Richfield Co.

Michael K. Wyatt of Steptoe & Johnson, Washington, D. C., for Fairmont Foods Co.

Philip A. Lacovara, Gerald Goldman and David M. Becker of Hughes, Hubbard & Reed, Washington, D. C., for Allen-Bradley Co. and Merck & Co., Inc.

Frank P. Cihlar and James R. Henderson, IV, of Mayer, Brown & Platt, Washington, D. C., for CPC Intern., Inc.; Cargill, Inc., Inland Steel Co., Northwest Industries, Inc.; Oscar Mayer & Co., Inc.; Ross Industries, Inc. and Sundstrand Corp.

John F. Graybeal and Robert C. Houser, Jr., of Foley, Lardner, Hollabaugh & Jacobs, Washington, D. C., for Square D. Co.

William Simon, Harold F. Baker, David C. Murchison, J. Wallace Adair, John DeQ. Briggs and Stuart H. Harris of Howrey & Simon, Washington, D. C., for American Cyanamid Co., et al.

Jack L. Lipson, Andrew S. Krulwich and Hadrian R. Katz of Arnold & Porter, Washington, D. C., for Hoffmann-La Roche Inc. and Lone Star Industries, Inc.

Philip J. Davis of Kirkland, Ellis & Rowe, Washington, D. C., and Donald G. Kempf, Jr., and Joseph F. Coyne of Kirkland & Ellis, Chicago, Ill., for Chemetron Corp., Dean Foods Co., The Firestone Tire & Rubber Co., FMC Corp., Harnischfeger Corp., Kirsch Co., Lehigh Portland Cement Co., Motorola, Inc., Polaroid Corp., and Rexnord, Inc.

Peter E. Fleming, Jr., Eliot Lauer and Samuel F. Abernethy of Curtis, Mallet-Prevost, Colt & Mosle, New York City, for Dover Corp.

James F. Rill and Kathleen E. McDermott, of Collier, Shannon, Rill, Edwards & Scott, Washington, D. C., for Carpenter Technology Corp., Kohler Co., Safeway Stores, Inc., and A. E. Staley Mfg. Co.

Theodore A. Groenke and Harold J. Bressler of McDermott, Will & Emery, Chicago, Ill., for Kohler Co. and A. E. Staley Mfg. Co.

James F. Bromley of Macleay, Lynch, Bernhard & Gregg, Washington, D. C., for U. S. Gypsum Co.

Harold S. Barron and Noel C. Crowley of the Bendix Corp., Southfield, Mich., for The Bendix Corp.

Arloe Mayne, Gen. Counsel, Ashland Oil, Inc., Ashland, Ky., and Ronald P. Wertheim, of Ginsburg, Feldman & Bress, Washington, D. C., for Ashland Oil, Inc.

Milton J. Schubin and Richard C. Seltzer, of Kaye, Scholer, Fierman, Hays & Handler, New York City, for GAF Corp.

Daniel K. Mayers and Neil J. King, of Wilmer, Cutler & Pickering, Washington, D. C., and James R. DeVita of Sullivan & Cromwell, New York City, for American Standard, Inc.; The Babcock & Wilcox Co., Ford Motor Co., The General Tire & Rubber Co.; and Kaiser, Aluminum & Chemical Corp.

James M. Porter, of Squire, Sanders & Dempsey, Cleveland, Ohio, and William C. Collishaw of Cox, Langford & Brown, Washington, D. C., for White Consolidated Industries, Inc.

David S. Pennock of Alexander & Green, New York City, for Cerro-Marmon Corp.

Samuel K. Abrams and Wilbur L. Fugate of Morison, Murphy, Abrams & Haddock, Washington, D. C., for Cone Mills Corp. and The Sperry & Hutchinson Co.

Raymond E. Vickery, Jr., of Hogan & Hartson, Washington, D. C., for Hughes Tool Co. and Republic Steel Corp.

Ramsay D. Potts and Steven L. Meltzer of Shaw, Pittman, Potts & Trowbridge, Washington, D. C., for Emerson Elec. Co.

Leonard I. Horowitz of Times Mirror Co., New York City, for Times Mirror Co.

Barry Hirsch of Loews Corp., New York City, for Loews Corp.

Milton Wolson and Edwin Silverstone of SCM Corp., New York City, and S. White Rhyne, Jr.,' of Mullin, Connor & Rhyne, Washington, D. C., for SCM Corp.

Sydney B. Wertheimer of Weisman, Celler, Spett, Modlin, Wertheimer & Schlessinger, New York City, for Fedders Corp.

Paul J. Newlon and Victoria G. Traube of Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Milliken & Co.

Fred L. Woodworth of Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., for Overhead Door Corp. and Champion Home Builders Co.

Philip W. Schaefer of Texaco Inc., New York City, for Texaco Inc.

Jesse P. Luton, Jr., John E. Bailey and Kevin F. Cunningham of The Gulf Companies, Houston, Tex., for Gulf Oil Corp.

Joseph W. Burns of Burns, Van Kirk, Greene & Kafer, New York City, for Ingersoll-Rand Co.

Albert R. Connelly and Andrew D. Postal of Cravath, Swaine & Moore, New York City, for Bethlehem Steel Corp.; Cincinnati Milacron, Inc.; Kellogg Co.; Olin Corp.; Republic Steel Corp.; Rhinechem Corp.; and Time Inc.

Edwin S. Rockefeller and Alan M. Frey of Bierbower & Rockefeller, Washington, D. C., for Norton Simon Inc.

Norman Solovay of Holtzman, Wise & Shepard, New York City, and Leonard M. Kessler of Kelley Drye & Warren, New York City, for Chrysler Corp.

Charles H. McAuliffe of Thomas J. Lipton, Inc., Englewood Cliffs, N. J., for Thomas J. Lipton, Inc.

David J. Lewis and Elroy H. Wolff of Sidley & Austin, Washington, D. C., for Thomas J. Lipton, Inc. and Kimberly-Clark Corp.

Robert D. Tyler, Jr., of Beatrice Foods Co., Chicago, Ill., and John R. Reilly of Winston & Strawn, Washington, D. C., for Beatrice Foods Co.; Rorer-Amchem, Inc., Fort Washington, Pa.

Kenneth Schnaper of Crane Co., New York City, for Crane Co.

Eve E. Bachrach of Stein, Mitchell & Mezines, Washington, D. C., for C.I.T. Financial Corp. and Food Fair Stores, Inc.

Thomas C. Morrison of Patterson, Belknap, Webb & Tyler, New York City, for Johnson & Johnson.

Dennis M. Sheedy of Kirkpatrick Lockhart Johnson & Hutchison, Pittsburgh, Pa., for Cyclops Corp.

Donald J. Mulvihill and Gerald J. Brown of Cahill, Gordon & Reindel, Washington, D. C., for The Great Atlantic & Pacific Tea Co., Inc.

Andrew J. Kilcarr of Donovan, Leisure, Newton & Irvine, Washington, D. C., and Thomas R. Trowbridge, III, of Donovan, Leisure, Newton & Irvine, New York City, and Charles F. Rice of Mobil Oil Corp., New York City, for Mobil Oil Corp.

Donald G. McCabe and Anthony B. Barton of Hall, McNicol, Hamilton & Clark, New York City, for American Maize-Products Co.

Charles Kadish of Breed, Abbott & Morgan, New York City, for Honeywell, Inc.

Gilbert H. Weil and Robert L. Sherman of Weil, Guttman & Davis, New York City, for Bristol-Myers Co.

Caswell O. Hobbs, III, and David W. Huston of Morgan, Lewis & Bockius, Washington, D. C., for American Stores Co.

David C. Trowbridge of Hallmark Cards, Inc., Kansas City, Mo., for Hallmark Cards, Inc.

Ronald G. Precup of Nussbaum & Owen, Washington, D. C., for American Beef Packers, Inc.

Stephen Kurzman of Nixon, Hargrave, Devans & Doyle, Washington, D. C., for Bausch & Lomb, Inc.; Dunlop Tire & Rubber Corp., Buffalo, N.Y.; NL Industries, Inc., New York, N.Y.; R. T. French Co., Rochester, N.Y.

Larry L. Williams and Robert J. Pope of Clifford, Glass, McIlwain & Finney, Washington, D. C., for The Continental Group, Inc. (formerly Continental Can Company, Incorporated).

Robert J. Lewis, Gen. Counsel; Gerald P. Norton, Deputy Gen. Counsel; Jerold D. Cummins, Acting Asst. Gen. Counsel; Warren S. Grimes, Joanne L. Levine, and Thomas A. Sheehan, III, Attys., F.T.C., Washington, D. C., for petitioner-defendant F.T.C.

Barbara Allen Babcock, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., David J. Anderson and Jack E. Thornton, Jr., Dept. of Justice, Washington, D. C., for defendant Comptroller General.

## MEMORANDUM OPINION

FLANNERY, District Judge.

The court presently has before it consolidated preenforcement and enforcement actions concerning the Federal Trade Commission's orders directing numerous companies to file certain special reports. At issue are the FTC's information-gathering activities with respect to the 1974 Line of Business (LB) report and the Corporate Patterns Report (CPR) survey. The court already has considered various motions to dismiss. Order of Jan. 31, 1977. The FTC and the Comptroller General have moved for summary judgment at this time, while the corporate parties seek partial summary judgment. Oral hearings on these motions were held February 11 and 25, 1977, and the motions are ripe for consideration and decision at this time.

The corporate parties challenge the enforcement of the FTC's orders to file the LB and CPR forms on a number of grounds. The court will consider each of these claims in turn. An appropriate order accompanies this memorandum opinion.

### I. Statutory Authority

The corporate parties contend that the FTC lacks the statutory authority to implement the LB and CPR programs. This claim centers on an interpretation of section 6 of the Federal Trade Commission Act, 15 U.S.C. § 46.[1] While the corporate parties admit that section 6 relates to the general

---

1. Section 6 provides, in relevant part:

 The Commission shall also have power—

 (a) To gather and compile information concerning, and to investigate from time to time the organization, business conduct, practices, and management of any person, partnership, or corporation engaged in or whose business affects commerce, excepting banks and common carriers subject to the Act to regulate commerce, and its relation to other persons, partnerships, and corporations.

 (b) To require, by general or special orders, persons, partnerships, and corporations, engaged in or whose business affects commerce, excepting banks and common carriers subject to the Act to regulate commerce, or any class of them, or any of them, respectively, to file with the Commission in such form as the Commission may prescribe annual or special, or both annual and special, reports or answers in writing to specific questions, furnishing to the Commission such information as it may require as to the organization, business, conduct, practices, management, and relation to other corporations, partnerships, and individuals of the respective persons, partnerships, and corporations filing such reports or answers in writing. Such reports and answers shall be made under oath, or otherwise, as the Commission may prescribe, and shall be filed with the Commission within such reasonable period as the Commission may prescribe, unless additional time be granted in any case by the Commission.

power of the Commission to conduct investigations, require special or annual reports, and publish the results of its investigations, they argue that section 6 is not an unfettered grant of authority to conduct any type of investigation or information-gathering project. To the corporate parties, section 6 grants the authority to investigate, so long as the investigation is related to the FTC's enforcement authority, but does not grant the power to conduct statistical reporting programs. In support of this proposition, the corporate parties offer an imaginative interpretation of the legislative history of the Act and relevant judicial decisions.

The linchpin of the corporate parties' argument is that the LB and CPR programs are not focused investigations. If not investigations, they contend, then the section 6(b) special report orders do not relate to the Commission's section 6(a) power of investigation and do not relate to the Commission's quasi-judicial powers under section 5 of the Act. Since the FTC admits that the LB and CPR programs are broad-based and not aimed simply at suspected violators, the corporate parties reason that they cannot qualify as legitimate investigations. Instead, these statistical reporting programs are more in the nature of a fishing expedition; the corporate parties charge that without a direct link to the Commission's substantive responsibilities these section 6(b) orders could intrude indiscriminately into the private domain.

■ The corporate parties suggest that the legislative history of the FTC Act supports the view that section 6 was intended only as an aid to section 5 powers. Without exhaustively repeating the arguments of both the corporate parties and the FTC on this question, the court can reject the corporate parties' claim to the extent that it suggests the FTC was intended to be only a quasi-judicial agency with information-gathering powers narrowly limited to its quasi-judicial functions.[2] The corporate parties bottom their argument on a statement by Senator Newlands, made after the enactment of the Act, that the FTC's exercise of its investigatory powers would be limited to those suspected of violating the law.[3] Apart from the problem of personal, post-hoc explanations as legislative history, a fair reading of the legislative history does not support that view.[4] First, the FTC was intended to assume, *inter alia,* the powers formerly held by the Bureau of Corporations, a research and investigatory agency with no law enforcement powers. H.R.Rep. No.1142, 63d Cong., 2d Sess. 18 (1914) (conference report). Second, while the conferees did indeed rely largely on the Senate bill, they exhibited no intent to cut down the broader powers present in the House bill.[5] Finally, statements made by Senator Newlands himself suggest that the FTC would have vast discretion in determining its special reports needs.[6] In short, the legislative history does not support the corporate parties' claims.

■ The corporate parties next rely on their interpretation of several cases. The corporate parties attempt to distinguish the most important of these cases, *United States v. Morton Salt Co.,* 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950), on the ground that *Morton Salt* decided only the question of whether a section 6 special report order could be used in aid of the Commission's section 5 quasi-judicial powers; it did not decide whether a section 6 order can fly "solo." Indeed, the corporate parties cor-

---

**2.** This argument is based, in part, on the claim of ascendancy of the Senate bill over the House bill in the final enactment of the Act.

**3.** Newlands, *The Federal Trade Commission Bill,* Am.Rev. of Reviews 477, 479–80 (Oct. 1974). Senator Newlands also made a similar statement on the floor, but there is a question whether he later retracted that statement. 51 Cong.Rec. 11110 (1914).

**4.** *See generally* Handler, *Constitutionality of Investigations by the Federal Trade Commission,* 28 Colum.L.Rev. 708 (1928).

**5.** *Id.* at 732.

**6.** *E. g.,* 51 Cong.Rec.11182 (1914).

rectly state the holding of that case.[7] Yet the proper inference to be drawn from *Morton Salt,* in this court's opinion, is that section 6 orders can be used *both* in aid of section 5 responsibilities and in support of general economic reports. The Court rejected an argument made there that section 6 reports "can be required only 'in support of general economic surveys and not in aid of enforcement proceedings under Section 5.' "[8] The Court characterized the special report provision as enabling the Commission to elicit "any information" beyond the normal data of an annual report.[9] The corporate parties also cite *FTC v. American Tobacco Co.,* 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696 (1924). There the Supreme Court rejected the FTC's claim that sections 5 and 6 permitted the Commission an unlimited right of access to the tobacco companies' papers and files.[10] Not even the corporate parties claim this early case to be directly applicable to the present circumstances, however; the FTC here does not seek unlimited access. Two lower court rulings also bear on the issue, in the corporate parties' minds. *FTC v. Claire Furnace Co.,* 52 App.D.C. 202, 385 F. 936 (1923), *rev'd,* 274 U.S. 160, 47 S.Ct. 553, 71 L.Ed. 978 (1927); *United States v. St. Regis Paper Co.,* 181 F.Supp. 862 (S.D.N.Y.), *aff'd in part & rev'd in part,* 285 F.2d 607 (2d Cir. 1960), *aff'd,* 368 U.S. 208, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961). Yet the D.C. Circuit in *Claire Furnace* considered the question of the FTC's power to investigate in the context of whether "interstate commerce" was shown, and did not consider the issue presented here. The district court in *St. Regis* did comment on the scope of section 6(b) orders with respect to material not kept in the regular course of business, but its conclusion was endorsed neither by the Second Circuit nor by the Supreme Court. Thus the case relied on by the corporate parties present far from a compelling argument for lack of statutory authority.

■ Having found the corporate parties' interpretation of the legislative history and caselaw unconvincing, the court additionally finds the plain wording of section 6(b) to sustain the statutory authority of the Commission to act with respect to LB and CPR. That section permits the Commission to "require, by general or special orders, . . . [companies] to file with the Commission in such form as the Commission may prescribe annual or special . . . reports . . ." 15 U.S.C. § 46(b). This express authorization certainly appears to include the special reports sought in the LB and CPR orders. On the basis of this clear wording, Judge Schwartz found no probable merit to the corporate parties' similar claim for the 1973 LB orders.[11] While some limit may exist to the FTC's power to require special reports under section 6(b), that issue does not really arise where, as here, even the corporate parties admit that the programs are at least indirectly connected to the Commission's law enforcement efforts.[12] Nothing in the statute, legislative history, or caselaw supports the corporate parties' alternative claim that section 6 authority may be exercised only in contemplation of specific law enforcement activity.[13] The court thus concludes that the FTC acted within its statutory authority in implementing the LB and CPR special reports program.

---

7. 338 U.S. at 649, 70 S.Ct. at 367.

8. *Id.*

9. *Id.* at 650, 70 S.Ct. at 367.

10. 264 U.S. at 305–07, 44 S.Ct. 336.

11. *A. O. Smith Corp. v. FTC,* 396 F.Supp. 1108, 1120–21 (D.Del.1975), *rev'd on other grounds,* 530 F.2d 515 (3d Cir. 1976).

12. The Commission states its hope to use LB data to focus its law enforcement efforts more effectively, and to use CPR data to provide a data base to be used by the FTC in formulating overall enforcement policy and in investigating and proceeding against particular law violations.

13. This argument derives, no doubt, from the corporate parties' belief that the LB and CPR programs are merely statistical reporting programs, not focused on ascertainment of possible violations of law. This view is not wholly justified. *See* note 12 *supra.*

## II. Rulemaking under the APA

The corporate parties claim that the LB and CPR programs constitute rulemaking within the meaning of the Administrative Procedure Act (APA) and that the FTC violated the applicable APA provisions concerning rulemaking. This claim presents two separate issues: whether the programs constitute rulemaking, and, if so, whether the FTC complied with the APA rulemaking requirements.

The APA defines a "rule" as

the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of any valuations, costs, or accounting, or practices bearing on any of the foregoing.

5 U.S.C. § 551(4). Rulemaking is defined as "agency process for formulating, amending, or repealing a rule." *Id.* § 551(5). The corporate parties contend that the LB and CPR programs [14] fall within this statutory definition and thus qualify as rulemaking. The APA identifies several components of a rule: it must be of "general or particular applicability"; it must be of "future effect"; and it must be designed to "implement, interpret, or prescribe law or policy". The court first will consider whether the LB and CPR programs implement or prescribe law or policy.

The corporate parties contend that the LB and CPR programs implement or prescribe law or policy in two ways. First, as Judge Schwartz found with respect to the 1973 LB orders in granting a preliminary injunction to the corporate parties, the "far-reaching directives . . . effec-

tively prescribe the manner in which business records are to be kept for reporting purposes. . . ." *A. O. Smith Corp. v. FTC*, 396 F.Supp. 1108, 1123 (D.Del.1975), *rev'd on other grounds*, 530 F.2d 515 (3d Cir. 1976). Indeed, if the FTC has prescribed accounting methods, it has engaged in rulemaking since the definition of a rule "includes the approval or prescription for the future of . . . valuations, costs, or accounting, or practices bearing on any of the foregoing." 5 U.S.C. § 551(4). The corporate parties suggest that the data sought by the Commission is not available from the books and records of most firms; the internal organization of most businesses does not correspond to the uniform category system envisioned by the LB reports. The court cannot agree that the 1974 LB orders, the CPR orders, or the programs have effectively prescribed accounting methods or practices with respect to business records maintained for reporting purposes. Certainly the FTC has not actually prescribed new accounting methods. Rather, the corporate parties' argument reduces to the contention that the required certification of accuracy forces them to revise their systems of accounts to prevent false certification. It is clear, however, that the programs do not require any company to alter present recordkeeping practices; the Commission in no way prescribes accounting methods, although certain companies may wish voluntarily to alter their procedures. In addition, the FTC has made it clear that certain estimates are permitted on the forms, and this certainly mitigates the stringency of the accuracy certification. Moreover, the corporate parties can hardly claim that the present orders have prescribed accounting methods, since the present orders seek data from years past; the corporate parties in effect argue that they may change accounting practices if these programs are continued in subsequent years. For these reasons the court con-

14. The corporate parties have not been entirely clear about which aspects of the two programs they consider to be "agency statement" under the APA. In their papers, the corporate parties appear to characterize the whole programs as the "statement". At oral hearing on this question, counsel for the corporate parties defined the relevant "statement" as "all of the FTC's minutes, resolutions, and statements, which in combination" reflect the two programs.

cludes that the LB and CPR programs do not implement or prescribe law or policy by effectively requiring certain accounting practices.[15]

■ The corporate parties alternatively claim that the programs implement law or policy in their effect on FTC antitrust enforcement goals and, if the data is published, on private investment decisions.[16] The corporate parties have failed to specify concretely how the possible, or even planned, future use of the data generated by LB and CPR give those programs sufficient regulatory impact for the court to conclude that the programs themselves implement law or policy. The corporate parties seek to ascribe to the special reports programs a "regulatory purpose" merely on the basis of the possible future use to which the data might be put. This argument goes too far. If data collected for possible future use by the Commission in implementing its law or policy can itself be considered to implement law or policy, then all types of agency activity, including agency subpoenas, similarly could qualify as rulemaking. The data collection effort does not itself implement law or policy, although the later regulatory steps the Commission might choose to take in partial reliance on the data submitted could do so. The programs cannot fairly be construed as "regulating" the FTC's resource allocation decisions, nor can they be viewed simplistically as vehicles to implement the Commission's section 6(f) publica-

tion power. In sum, the corporate parties' contentions of regulatory purpose are far too attenuated to convince the court to decide that the special reports programs are designed to implement or prescribe law or policy.

■ Because of its decision on this issue, the court need not decide whether the LB and CPR programs meet the other two definitional requirements of a rule: generalized or particular applicability and future effect. The court has serious doubts whether the corporate parties correctly apply those standards to the present cases, but such a determination is unnecessary to the conclusion that the programs do not constitute rules under the APA.[17]

The court need not rely solely on its own interpretation of what implements or prescribes law or policy to conclude that a special reports program does not constitute rulemaking under section 551. Only one case, other than Judge Schwartz' preliminary decision, has been cited by the parties on the question of whether agency information-gathering through the requirement of special reports constitutes rulemaking. *United States v. W. H. Hodges & Co.*, 533 F.2d 276 (5th Cir. 1976). In *Hodges*, the Fifth Circuit considered an order by the Secretary of Agriculture directing 38 stockyard marketing agencies to file a special report in the course of an investigation of rates charged by the markets. The Secre-

15. The corporate parties also argue that the programs constitute rulemaking because the FTC will prescribe valuations and costs for the LB program. To the extent such valuations or costs will be prescribed by the FTC staff, they will be for internal purposes and will not impose obligations on the companies. Thus such valuations do not meet the definition of a rule under 5 U.S.C. § 551(4).

16. The corporate parties have described this claim variously during the pendency of this action. In their LB partial summary judgment motion, the corporate parties focused on the "regulatory resource allocation purposes", asserting that the programs seek to regulate the Commission's own resource allocation and, through publication, investment decisionmaking. This the corporate parties term "regulation through publicity." In their reply to their motion the corporate parties stressed private

sector reallocation of resources by investment decisions and the Commission's design to restructure industries singled out by the data for antitrust enforcement. At oral hearing, counsel for the corporate parties broadly asserted that the programs are designed to implement section 6(f) of the FTC Act, which permits the FTC to publish certain information it gathers, and further stated that the programs are designed to implement enforcement policies. At a later point, counsel pointed to the "composite effect" of the purposes to which the data might be put as evidence that the programs prescribe law or policy.

17. For the same reasons the court does not consider the FTC's claim that, even if the programs are rules, they fall within the section 553 exception for "general statements of policy."

tary required these reports pursuant to his authority under the Packers and Stockyards Act,[18] a statute that expressly incorporates section 6 of the FTC Act to give the Secretary the authority to order that special reports be filed. In response to the objection that the special reports orders constituted rulemaking under the APA, the Fifth Circuit held:

> The order at issue here was clearly investigatory in nature, as opposed to an adjudicatory or rule-making process, and hence not subject to the procedures governing rule-making outlined in the APA. *Cf. Genuine Parts Co. v. F.T.C.*, 445 F.2d 1382, 1388 (5th Cir. 1971); K. Davis, *Administrative Law Treatise*, § 3.01 at 159, n. 1 (1958).

533 F.2d at 278. The corporate parties attempt to distinguish this case on the ground that the special report orders concerned a focused investigation of rate practices and sought information kept in the normal course of business.[19] The corporate parties then reiterate their contention that the LB and CPR programs do not constitute investigations. Yet the court is not convinced that these information-gathering programs conceptually or in legal effect constitute more than investigations despite the large number of corporations ordered to file the special report forms.

In addition, the APA itself appears to distinguish the concepts of rulemaking, adjudication, and ancillary matters such as investigations or reports requirements. Section 553 deals with rulemaking requirements, section 554 concerns adjudications, and section 555 is entitled "Ancillary matters." Section 555(c) provides that "requirement of a report . . . or other investigative act or demand may not be issued, made, or enforced except as authorized by law." 5 U.S.C. § 555(c). Although

the APA does not explicitly state that rulemaking and reports requirements thus are mutually exclusive, the juxtaposition of these sections makes that a not unreasonable inference. Indeed, the chief House sponsor of the APA, Representative Walter, explained during the APA's consideration that the "bill carefully distinguishes between these three basic types of administrative regulatory powers." 92 Cong.Rec. 5648 (1946). The three basic types of regulatory administrative operations mentioned by Representative Walter included rulemaking, adjudication, and compulsory action. Walter delineated the third category as follows:

> I refer to the compulsory action of administrative agencies when they issue subpoenas, require records or reports, or undertake mandatory inspections. These functions are investigative in nature. The investigation may be made in connection with their legislative or judicial functions, or it may be made for the purpose of submitting a report to Congress or to refer prosecutions to a grand jury. Whatever the purpose, the administrative arm is given power to require information to be submitted to it.

*Id.* The court is aware that Judge Schwartz reached an opposite decision from that of this court on the conclusions to be drawn from the subdivisions of the APA and the legislative history.[20] The differences of opinion may not be irreconcilable, however, to the extent that Judge Schwartz held only that section 555 does not absolutely preclude a finding that a special reports program could be subject to rulemaking requirements.[21] This court does not conclude that section 555 prohibits such a finding in all cases, only that an inference can be drawn from the subdivisions of the APA and its legislative history that would make

18. 7 U.S.C. § 222.

19. The FTC contends, as to the latter point, that the respondents in *Hodges* claimed that the material sought was not available in the ordinary course of business. The Fifth Circuit did not answer this question.

20. *A. O. Smith Corp. v. FTC*, 396 F.Supp. 1125, 1133 (D.Del.1975), *rev'd on other grounds*, 530 F.2d 515 (3d Cir. 1976).

21. *Id.* ("The Court cannot hold that Congress intended in Section 555 to obviate the applicability of all other procedural provisions of the APA.").

a determination that a special reports order constitutes rulemaking doubtful.[22]

■ Finally, the court believes that the FTC's "characterization of its own proceeding is entitled to weight, and that characterization may in turn have relevance in determining the applicability" of the APA rulemaking requirements. *ITT v. Local 134, Electrical Workers,* 419 U.S. 428, 441, 95 S.Ct. 600, 609, 42 L.Ed.2d 558 (1975) (applicability of APA adjudication provisions). The corporate parties do not dispute that the FTC has maintained that the APA rulemaking provisions do not apply to its special reports program. The Quarterly Financial Reports Program, the early CPR Program, and the Premerger Notification Program all provide evidence that the Commission has never considered the rulemaking requirements of the APA to apply to a special reports program. Therefore, although an agency's characterization of the applicability of the APA is entitled to no more than "weight" and cannot be used to disguise the true nature of agency action, in this instance the FTC's longstanding interpretation of the APA adds support to the court's conclusion that the LB and CPR programs do not constitute rulemaking.

Thus the court concludes that the programs do not implement or prescribe law or policy and do not fit the definition of rule-

making. The *Hodges* decision supports this conclusion, as do the subheadings of the APA itself, its legislative history, and the FTC's longstanding interpretation of the applicability of the APA rulemaking provisions. Having so concluded, the court need not and does not consider whether the FTC complied with the APA requirements for rulemaking, 5 U.S.C. § 553.

## III. Census Act

The corporate parties claim that the CPR program [23] violates section 9 of the Census Act, 13 U.S.C. § 9.[24] This contention is based on the assertion that the CPR survey seeks the same information the corporate parties provide to the Bureau of Census for its quinquennial Census of Manufacturers in the form of value of shipments data by establishment and 5-digit Census product code for the year 1972. The FTC concedes that one purpose of the CPR program is to produce individual company data that it can compare to published Census aggregates. A determination of whether the CPR program is unlawful because it violates the confidentiality provisions of section 9 of the Census Act requires analysis both of the 1962 amendment to that Act and of the relevant caselaw.

No case before 1962 held that section 9's protection extended beyond the actual Cen-

---

22. The House Report accompanying the APA noted that section 555 prescribed the rights of private parties in miscellaneous respects that might be "incidental to rulemaking, adjudication, *or the exercise of any other agency authority."* H.R.Rep.No.1980, 79th Cong., 2d Sess. 1206 (1946), U.S.Code Cong.Serv. 1946, pp. 1195, 1206 (emphasis supplied).

23. The corporate parties' Census Act claims also encompass the LB program to the extent that the LB form seeks value of shipments data by Census definitions.

24. Section 9 provides, in relevant part:
 (a) Neither the Secretary, nor any other officer or employee of the Department of Commerce or bureau or agency thereof, may, except as provided in section 8 of this title—
 (1) use the information furnished under the provisions of this title for any purpose other than the statistical purposes for which it is supplied; or

(2) make any publication whereby the data furnished by any particular establishment or individual under this title can be identified; or

(3) permit anyone other than the sworn officers and employees of the Department or bureau or agency thereof to examine the individual reports.

No department, bureau, agency, officer, or employee of the Government, except the Secretary in carrying out the purposes of this title, shall require, for any reason, copies of census reports which have been retained by any such establishment or individual. Copies of census reports which have been so retained shall be immune from legal process, and shall not, without the consent of the individual or establishment concerned, be admitted as evidence or used for any purpose in any action, suit, or other judicial or administrative proceeding.

sus form, copies of it, or the actual data schedules submitted to Census. In *United States v. Bethlehem Steel Corp.*, 21 F.R.D. 568 (S.D.N.Y.1958), the district court considered whether private steel producers could obtain Census reports of other steel manufacturers from the Department of Commerce. Judge Weinfeld held that the Census Act protected the Department of Commerce from compelled disclosure of the reports.[25] In *Federal Trade Commission v. Orton*, 175 F.Supp. 77 (S.D.N.Y.1959), the district court held that the FTC could not subpoena certain data schedules submitted by respondent company to the Bureau of Census. In upholding the protection of Census data under section 9, the court noted that the FTC sought "the data not in order to get the facts which underlie the statistics, but rather to get the compiled statistical data in the particular manner in which it was prepared by the respondent. . . ." *Id.* at 80. Thus neither *Bethlehem Steel* nor *Orton* presented the question at issue here, since in the former case the actual reports were sought while in the latter case the FTC sought the "actual schedules submitted to the Bureau." *Id.* at 78.

The Supreme Court considered *St. Regis Paper Co. v. United States*, 368 U.S. 208, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961), to resolve a conflict between the circuits on the question of whether the Census Act protected a company's retained file copy of the report sent to Census. The Seventh Circuit decided that the retained file copies merited section 9 protection,[26] while the Second Circuit determined that the file copies did not so qualify.[27] The Supreme Court affirmed the Second Circuit, holding that section 9 did not protect a company's retained file copies from compelled disclosure. 368 U.S. at 218–20, 82 S.Ct. 289.

Soon thereafter, in response to the *St. Regis* decision, Congress amended section 9 of the Census Act to add the following language:

No department, bureau, agency, officer, or employee of the Government, except the Secretary in carrying out the purposes of this title, shall require, for any reason, copies of census reports which have been retained by any such establishment or individual. Copies of census reports which have been so retained shall be immune from legal process, and shall not, without the consent of the individual or establishment concerned, be admitted as evidence or used for any purpose in any action, suit, or other judicial or administrative proceeding.

13 U.S.C. § 9(a). There can be no doubt that this amendment was intended to overrule legislatively the Supreme Court's holding in *St. Regis*. The key inquiry before this court, however, is whether the amendment was intended to protect more than the reports themselves or copies of them.

◼ In the court's mind, the legislative history of the 1962 amendment provides persuasive evidence that Congress did not intend to prohibit such programs as the CPR Survey in enacting the amendment. The House and Senate Reports refer consistently to "copies" of Census Reports.[28] A letter from the Secretary of Commerce, included in both reports, assured the Congress that the amendment would not impair the information-gathering authority of regulatory agencies as it existed prior to the *St.*

---

**25.** The corporate parties argue that Judge Weinfeld's use of the term "information" instead of "report" at certain points in the opinion demonstrates that *Bethlehem Steel* fairly can be read for the proposition that not only the report but the information contained therein is protected by section 9. To the extent that Judge Weinfeld intended "information" to mean more than a reference to the reports themselves, that issue was not before the court and statements thereon were just dicta.

**26.** *FTC v. Dilger*, 276 F.2d 739 (7th Cir.), cert. denied, 364 U.S. 882, 81 S.Ct. 171, 5 L.Ed.2d 104 (1960).

**27.** *United States v. St. Regis Paper Co.*, 285 F.2d 607 (2d Cir. 1960), aff'd, 368 U.S. 208, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961).

**28.** S.Rep.No.2218, 87th Cong., 2d Sess. (1962); H.R.Rep.No.2437, 87th Cong., 2d Sess. (1962), U.S.Code Cong. & Admin.News 1962, p. 3188.

*Regis* decision.[29] The Secretary explained further:

> Furthermore, the ability of a regulatory agency to formulate inquiries, even ones identical with those asked by Census, would not be affected. The only restriction would be that the inquiry would not demand an answer by definition identical with that furnished the Census Bureau in another context and for another purpose.

Senate Report at 4, House Report at 7, U.S.Code Cong. & Admin.News 1962, pp. 3188, 3191. These two sentences go to the heart of the matter, for while the FTC in the CPR program has asked questions that may be answered with Census data, it has not insisted that companies supply the Census data itself. To the extent that these two sentences from the Secretary's letter can be construed harmoniously, this distinction would appear to be significant.[30] Perhaps even more significant is the fact that the original House bill would have protected "information, reports, and other data" instead of merely "copies". H. 10569, 82d Cong., 2d Sess. (1962). The limiting of the scope of the amendment was recommended by the Secretary of Commerce to "avoid any possibility that [the amendment] might be construed to affect documents other than file copies of census reports . . ." House Report, *supra*, at 5. In sum, the legislative history surrounding the passage of the 1962 amendment to section 9 provides impressive evidence that Congress did not intend to create blanket protection for all materials arguably related to the Census Reports.

■ The corporate parties' primary remaining contention, since the plain words of the amendment and the legislative history do not support their interpretation, is that the FTC should not be permitted to attain indirectly what it could not attain directly, or else the confidentiality protections anticipated by section 9 would be emasculated. Indeed, there is much to be said for the policies of confidentiality underlying the enactment of section 9. The protections of section 9 undoubtedly play an important role in ensuring the completeness and accuracy of the reports submitted to Census.[31] Yet the court cannot simply rely solely on this policy consideration in determining this issue, because it competes against another, equally legitimate policy consideration that calls for a narrower interpretation of section 9 protections. The court also must consider an agency's legitimate needs for certain data, including data arguably similar to that filed in Census Reports, in order to perform its statutory duties. Value of shipments data, for example, can be of great importance in antitrust analysis and prosecution.[32] Thus the court must balance the corporate parties' expectation of confidentiality with the FTC's legitimate information-gathering needs and cannot give maximum potential expression to policy considerations of confidentiality. Any confidentiality privilege granted by section 9, therefore, is but a qualified privilege that must be weighed in conjunction with the FTC's right to collect relevant data.

The court is convinced, moreover, that the Census Act itself, both before and after the 1962 amendment, properly discerned and balanced the competing policy considerations. Section 132 of the Act, 13 U.S.C. § 132, provides that

---

**29.** Senate Report, *supra*, at 4; House Report, *supra*, at 7. The court already has indicated that it interprets the state of the law prior to *St. Regis* differently than the corporate parties.

**30.** *See e. g.*, Brief for the United States, *St. Regis Paper Co. v. United States*, 368 U.S. 208, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961), at 30–31.

**31.** *See United States v. IBM*, 1975–2 Trade Cas. ¶ 60,383 (S.D.N.Y.1975); *FTC v. Orton*, 175 F.Supp. 77 (S.D.N.Y.1959); *United States v. Bethlehem Steel Corp.*, 21 F.R.D. 568 (S.D.N.Y. 1958). *See also St. Regis Paper Co. v. United States*, 368 U.S. 208, 228–29, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961) (Black, J., dissenting).

**32.** *See* Affidavit of Frederic M. Scherer, Director, Bureau of Economics, FTC, February 18, 1976, FTC Exhibit X; Affidavit of Michael L. Glassman, Assistant Director for Economic Evidence, Bureau of Economics, FTC, February 18, 1976, FTC Exhibit Y; Affidavit of Thomas E. Kauper, Assistant Attorney General, Antitrust Division, Department of Justice, February 19, 1976, FTC Exhibit DD.

nothing in this title shall be deemed to revoke or impair the authority of any other Federal agency with respect to the collection or release of information.

In addition, section 8 of the Act, 13 U.S.C. § 8, identifies certain circumstances in which the Secretary of Commerce may disclose Census data. The 1962 amendment protected "copies" rather than "information", and the legislative history makes clear that the amendment was not designed to impair an agency's information-gathering authority. House Report, *supra*, at 7.

For these reasons, the court finds the corporate parties' claims concerning the Census Act to be unsupported by the wording of the Act itself, the relevant caselaw, the circumstances surrounding the 1962 amendment, or the policy considerations underlying the Act.

## IV. Federal Reports Act

The corporate parties base a number of challenges to the LB and CPR programs on the Comptroller General's actions pursuant to his clearance review function over independent regulatory agencies' information-gathering activities under the Federal Reports Act, 44 U.S.C. §§ 3501–3512. Several issues arise from these claims: whether judicial review of the Comptroller's actions is unavailable because the matter is committed to agency discretion; whether the Comptroller applied the correct legal standard in performing his function under the Act with respect to the LB and CPR programs; and whether the Comptroller's clearance of these forms was in any case arbitrary, capricious, or an abuse of his discretion. For the reasons enumerated below, the court does not believe that the corporate parties' claims form a basis for invalidating these programs.

**33.** Memorandum Opinion of Jan. 31, 1977, at 22–24.

**34.** The court should note that in both *Westinghouse* and *General Electric* the courts made this determination in one sentence without ex-

### A. Availability of Judicial Review

■ This court previously has determined that judicial review of the Comptroller's actions under the Federal Reports Act is not barred by a Congressional intent to preclude review or by the availability of an adequate alternative remedy in court.[33] One further claim, raised by the FTC but not the Comptroller, suggests that the Comptroller's determinations under the Act are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This exception to the general rule of reviewability, if applicable, would preclude judicial review in this instance.

The FTC relies primarily on two cases finding that the Comptroller's actions under the Act are committed to his discretion. In *General Electric Co. v. FTC*, 411 F.Supp. 1004, 1006 (N.D.N.Y.1976), the district court found the Comptroller's decision committed to his discretion because "the statute characterizes his response to the agency as 'advice.'" *Id.* at 1006. Similarly, in *Westinghouse Electric Corp. v. Federal Trade Commission*, 1976–1 Trade Cas. ¶ 60,871 (S.D. Ohio 1976), the court found the Comptroller's decision committed to his discretion "because the statute characterizes the Comptroller General's response to the agency as 'advice.'" *Id.* at 68,816. The FTC also asserts that no case exists holding the Comptroller's determinations under the Act to be reviewable.

■ The court cannot agree with the conclusion of the FTC and the two district courts.[34] The committed to agency discretion exception to APA reviewability is a "very narrow" one. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The exception should be invoked only where a particular statute is drawn in such broad terms that there is in effect no law to apply in a given case. *Id., citing* S.Rep.No.752, 79th Cong., 1st Sess. 26 (1945). The Federal Reports Act, however, clearly sets forth two criteria under which the Comptroller is to

tensive analysis. In both cases, the courts decided to transfer the action; the comments on the Federal Reports Act were not critical to that decision.

make his review: avoiding unnecessary duplication and minimizing compliance burden.[35] The fact that the statute also characterizes the Comptroller's response to the agency as "advice" does not diminish the standards set by the Act for his review.[36] For these reasons the court concludes, at least as to whether the Comptroller considered duplication and burden, that there is law to apply and that judicial review of the Comptroller's actions is not wholly barred.

### B. *Appropriateness Inquiry*

The corporate parties contend that the Comptroller applied the incorrect legal standard in considering the LB and CPR forms insofar as he did not make a separate, substantive evaluation of the proposed forms' "appropriateness." This claim stems from the corporate parties' interpretation of certain language of the Act that mentions appropriateness:

> While the Comptroller General shall determine the availability from other Federal sources of the information sought and the *appropriateness* of the forms for the collection of such information, the independent regulatory agency shall make the final determination as to the necessity of the information in carrying out its statutory responsibilities and whether to collect such information. If no advice is received from the Comptroller General within forty-five days, the independent regulatory agency may immediately proceed to obtain such information.

44 U.S.C. § 3512(d) (emphasis supplied). The corporate parties suggest that appropriateness be construed in the sense of suitability for intended purpose, while the FTC and the Comptroller argue that appropriateness is merely a short-hand reference to the Comptroller's burden inquiry. The Comptroller concedes that he did not engage in a wide-ranging, substantive inquiry into the proposed forms' appropriateness.

█ The court is not convinced that Congress intended to create an entirely new substantive review criterion in this reference to appropriateness. First, the term appears only once in the Act, in a phrase qualifying the reservation of the determination of necessity to the agency. Second, in the sections of the Act that appear designed to detail the Comptroller's review criteria, only the burden and duplication standards are mentioned. See 44 U.S.C. §§ 3512(a), (b). Finally, the court believes that any substantive appropriateness inquiry by the Comptroller might well impermissibly compromise the express statutory provision reserving determination of need for the information to the agency. *Id.* § 3512(d). Rather, the court interprets the reference to appropriateness, as does the Comptroller himself,[37] as a short-hand reference to the burden inquiry. The legislative history contains no indication that an independent, substantive appropriateness inquiry was contemplated. *E. g.*, 119 Cong.Rec. 24085 (1973) (remarks of Senator Bentsen). The court's conclusion thus seems inevitable from a fair reading of the Act as a whole.

**35.** 44 U.S.C. § 3512(b) provides:

In carrying out the policy of this section, the Comptroller General shall review all existing information gathering practices of independent regulatory agencies as well as requests for additional information with a view toward—

(1) avoiding duplication of effort by independent regulatory agencies, and

(2) minimizing the compliance burden on business enterprises and other persons.

**36.** Indeed, Congress may have intended "advice" in the sense of communication or notice as well as in the sense of a recommendation or opinion.

**37.** The Comptroller has held the view that appropriateness does not require a separate, substantive inquiry ever since he promulgated regulations to implement the Act. *See* 39 Fed. Reg. 24346 (1974). The court believes that the agency's interpretation of its obligations under the Act is entitled to weight. Judge Schwartz in Delaware apparently also found that the Comptroller's review function relates only to burden and duplication. *A. O. Smith Corp. v. FTC*, 396 F.Supp. 1125, 1132 (D.Del.1975), *rev'd on other grounds*, 530 F.2d 515 (3d Cir. 1976).

## C. *Duplication*

 The corporate parties suggest that the Comptroller's treatment of the question of unnecessary duplication was insufficient to fulfill his responsibilities under the Act.[38] This claim relates to the fact that the Bureau of Census collects certain of the same data sought in the LB and CPR programs and publishes the data in aggregate form. The corporate parties admit, as they must, however, that the FTC is unable to obtain from Census the individual company data it desires because of the protections accorded by the Census Act.[39] Therefore, the court can hardly accuse the Comptroller of acting arbitrarily or capriciously in not disapproving the forms on the ground that they unnecessarily duplicate the effort of the Census Bureau. The individual company data, for which the FTC expresses a need that the Comptroller cannot challenge, is simply not available to the FTC; in view of the requirements of the Census Act, any duplication that has occurred could hardly be termed unnecessary by the Comptroller, and his approval should not be invalidated on that ground.[40]

## D. *Burden*

 The corporate parties raise several complaints with respect to the Comptroller's handling of the question of minimum burden. First, the corporate parties contend that an adequate burden assessment cannot be made in the absence of a concomitant assessment of the meaningfulness of the data to be collected.[41] The court cannot find, however, that the Act requires by implication such a detailed cost-benefit analysis. The plain words of the Act itself, the 45-day limitation on the Comptroller's consideration of proposed forms, and the reservation of need determination to the agency all point to a more limited interpretation of the Comptroller's responsibilities with respect to assessing burden.[42]

Second, the corporate parties argue that the Comptroller failed to obtain a valid estimate of compliance burden for the CPR form. The court finds no merit to this claim, which rests on the premise that the FTC expected the companies to use their Census Reports in completing the form. The court has rejected the corporate parties' Census Act claim, § III, *supra*, and in any case the FTC's burden estimates were based on the availability of underlying data rather than the Census Reports themselves.

 Third, the corporate parties contend that the Comptroller could not rationally have approved the forms and at the same time have voiced such major concerns about the problem of burden. The LB clearance letter terms burden problems as "still incompletely resolved." The CPR program similarly was the subject of numerous comments alleging that the compliance bur-

---

**38.** The corporate parties appear to argue in this regard more that the clearance of the forms was arbitrary and capricious than that the Comptroller applied an incorrect legal standard. There is no question that the Comptroller considered the question of unnecessary duplication. The court decides this question in any case under the standards of 5 U.S.C. § 706(2).

**39.** Indeed, the corporate parties elsewhere argue that the FTC cannot even obtain the underlying information from them. *See* § III, *supra*.

**40.** Nor can the court say that the Comptroller should have disapproved the forms because of overlap with the Quarterly Financial Reports Program or the Premerger Notification Program, since any overlap with these programs is slight.

**41.** The corporate parties' point is that any burden would be too high for a meaningless program.

**42.** The court would reserve judgment on this question if, as in counsel's hypothetical at oral argument, the complete and utter lack of meaningfulness of the form for its stated purpose were so patent that a child could recognize it. The value of the LB and CPR data, however, does not present this question, as expert economists disagree on it.

den was "grossly underestimated." The court rejects the corporate parties' final avenue of attack on burden. The Act does not require a Comptroller's finding of no burden; the Comptroller weighed the evidence on both sides and determined to clear the forms. The Comptroller noted that improvements in the LB form lowered the compliance burden from that of the 1973 form, and it is clear that the Comptroller considered and rejected claims of undue burden in the CPR program.

## E. *GAO Regulations*

The corporate parties also contend that the clearance of the CPR form was invalid for failure to comply with the General Accounting Office Regulations promulgated to implement the Federal Reports Act, 4 C.F.R. §§ 10.1–10.12. The corporate parties charge defects in required FTC solicitation of views of persons to be affected,[43] and in the failure of the FTC's supporting statement submitted to GAO to detail the necessity for the program,[44] the major problems as to which agreement could not be reached in consultations outside the agency,[45] and the extent to which comments received from persons outside the agency are reflected in the plan.[46]

▇▇▇ The court considers it unnecessary to determine whether the alleged violations of these regulations in fact occurred. The regulations in question concern intra-governmental relations and are essentially intended to facilitate GAO review and clearance. In the court's mind, the regulations do not confer rights on private parties and do not preclude the GAO from waiving objections to noncompliance. Moreover, the regulations contain their own remedy for noncompliance: suspension or discontin-

43. 4 C.F.R. § 10.3(b)(2).

44. *Id.* § 10.10(c)(1)(i).

45. *Id.* § 10.10(d)(5).

46. *Id.*

47. As to the latter point, the corporate parties argue that the regulations force agencies to shoulder a planning burden and assure the public a basis on which to comment to the GAO.

uance of GAO review and a tolling of the 45-day period upon a finding that the deficiency "precludes complete and effective review." 4 C.F.R. § 10.9(a).

The Supreme Court considered a similar issue in *American Farm Lines v. Black Ball Freight Service,* 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970). There the ICC had granted a motor carrier a temporary operating authority. This action was challenged by protesting carriers on the ground that the ICC did not comply with its own regulations concerning processing of such temporary applications. Noting that the ICC should be given a "measure of discretion in administering its own procedural rules," the Court found that the regulations were designed for the purpose of providing the ICC with sufficient information to make a decision rather than to confer important procedural benefits on third parties. *Id.* at 538, 90 S.Ct. at 1292. The Court reaffirmed the general principle that an agency may relax procedural rules adopted for the orderly transaction of business and stated that judicial review of such action was available only upon a showing of "substantial prejudice." *Id.* at 539, 90 S.Ct. 173.

▇▇▇ The court finds this reasoning persuasive in this case. The corporate parties have demonstrated neither substantial prejudice nor that the regulations here were intended to confer important procedural rights on third parties.[47] The court believes that the GAO should be given some latitude in determining what constitutes adequate compliance in administering the regulations under the Act. In view of the fact that the court can find no substantial prejudice flowing from the alleged violation of the particular regulations at issue here,[48] the

These incidental effects, admittedly meant to facilitate GAO review, can hardly qualify as an intent to confer rights on private parties.

48. The corporate parties, in fact, appear to have been successful in making their views known to the GAO. The FTC made the views of other agencies known to the GAO and submitted additional material to it upon request. The corporate parties have not made a convincing showing of prejudice, much less substantial prejudice.

CPR program should not be invalidated on this ground.

## F. Experimental Clearance

The corporate parties, finally, contend that the 1974 LB form was cleared by GAO on an essentially "experimental" basis. The GAO clearance letter noted, *inter alia,* that the FTC had made "constructive efforts" to minimize burden, and that "a rather long test period of data collection and analysis will be required to fully reconcile FTC's data needs with minimum burden." These comments, the corporate parties suggest, taint the Comptroller's clearance on the burden question by introducing irrelevant factors and by failing to determine that the form assures a minimum burden; the period of experimentation contemplated, they claim, required the GAO to disapprove rather than approve the form.

 The court does not so construe the Comptroller's comments about the FTC's efforts to reduce burden. The court believes that the Comptroller did make the requisite burden determination; there exists in such programs an inherent tension between burden on the one hand and uniformity, accuracy, and value on the other. The Comptroller's statements reflect this awareness and essentially suggest that further efforts to minimize burden will depend on the FTC's definition of its data needs. The clearance, rather than experimental, was unconditional; the Comptroller merely offered his advice and observations on the continued implementation of the LB program in terms of a minimum burden consistent with the FTC's need for information. Indeed, the Comptroller recognized that the FTC had made strides in reducing burden in the 1974 form, although the Comptroller had approved the presumably more burdensome 1973 form too.

The court therefore finds no merit in any of the corporate parties' objections to the Comptroller's actions pursuant to the Federal Reports Act with respect to the LB and CPR programs. It thus refuses to invalidate either program on a ground stemming from the Act. The court does not find the Comptroller's actions in clearing the LB and CPR forms to have been arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## V. Publication of Trade Secrets

The corporate parties assert that the CPR program must be invalidated because it envisions publication of "trade secrets" in violation of section 6(f) of the FTC Act, 15 U.S.C. § 46(f). The resolution of the Commission authorizing the CPR program would permit public disclosure of individual company data as early as 1978; the corporate parties argue that data supplied for the CPR Survey, including costs, sales, assets, value of shipments, and inter-corporate relationships, constitutes trade secrets within the meaning of section 6(f). Section 6(f) provides:

> The Commission shall also have the power—[t]o make public from time to time such portions of the information obtained by it hereunder, *except trade secrets* and names of customers, as it shall deem expedient in the public interest; and to make annual and special reports to Congress and to submit therewith recommendations for additional legislation; and to provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use.

15 U.S.C. § 46(f) (emphasis supplied).

 Although the corporate parties claim that the intent to publish these trade secrets requires the court to invalidate the entire CPR program, the court on this ground at most could prohibit the FTC from publishing this data, not from collecting it.[49] Even if the court sustained the corporate parties' contention in full, that ruling would have no effect on the Commission's right to collect and the corporate parties' obligation to provide the CPR data.

---

**49.** The court quickly can reject any suggestion that the FTC seeks the CPR data only for the purpose of publishing it, since it is uncontested that the Commission also desires to develop on internal data bank with this data.

The court finds it unnecessary to reach the merits of the corporate parties' claim that the CPR data constitutes protected trade secrets under section 6(f) and that its publication is thereby prohibited. The FTC has made no final decision about whether to publish individual company CPR data; the corporate parties point to the Commission resolution authorizing the CPR program as evidence of the determination to publish. That resolution, though, simply states: "It is further resolved that no information for individual companies will be published before January 1, 1978." Resolution Authorizing and Directing the Collection of Economic Reports, July 29, 1975. The court cannot ignore, however, that publication of individual company data is an option the FTC deliberately has left open and apparently intends to employ at some later date. Nevertheless, it seems premature and perhaps unnecessary for the court to determine whether CPR data is protectible as trade secrets before the Commission has made a decision to publish that data. Even if the FTC has a present intention to publish the data at some unspecified later date, time or events might modify or reverse that intent.

■■■ The FTC itself will be in a position to rule on specific requests for confidential treatment [50] only after the information is submitted to the agency. *See Federal Trade Commission v. Texaco, Inc.,* 555 F.2d 862 at 873–874 (D.C. Cir. 1977) (en banc). Perhaps the corporate parties will be able to convince the Commission that confidential treatment of their data is necessary after they submit the CPR form and thus

are able to pinpoint more precisely the potential harm.[51] In order to protect the corporate parties from any precipitous action on the part of the FTC, the court will require, as did the Court of Appeals in *Texaco, supra* at 874–875, that the Commission give ten days' notice to any company of a decision to publish that company's individual data before actually doing so. In this way, the court does not preclude opportunity for a later judicial inquiry into the trade secrets claim, if necessary, in a setting where the inquiry and dispute would be framed concretely.[52] Therefore the court does not consider the trade secrets claim to preclude FTC collection of the CPR data and believes any claim concerning restraining publication of individual company data to be premature in the absence of a final decision to publish that data.

## VI. Adjudicative Respondents' Claims

Nine of the corporate parties currently are engaged in adjudicative proceedings before the Commission.[53] They suggest that the LB and CPR programs pose particular hazards to the protection of their legitimate procedural rights in the adjudicative proceeding. Specifically, the nine fear that the information received from these companies in the LB and CPR programs would achieve significant discovery not authorized by the Administrative Law Judge in those proceedings, thus violating the FTC's own rules of procedure, the equality requirement of the APA, and due process of law.

■■■ As in the corporate parties' trade secret claim, it is necessary for the court to

50. For example, Milliken claims a particular confidentiality hazard flowing from its status as a privately-held company and could submit its evidence of specific injury to the FTC after filing the CPR form.

51. The court does not consider the Commission's denial of motions to quash the CPR orders dispositive of this inquiry, as the denial of the motions to quash dealt with the claims that the companies did not have to file the CPR form at all because the data consisted of trade secrets.

52. The court might have hesitated to find the claim premature at this time had the corporate parties presented a compelling showing that

the CPR data constitutes trade secrets. The question, however, is at best a close one. Further, not all companies have detailed specifically the competitive harm disclosure would precipitate, and the court is unable to make the required determination without individualized information.

53. ARCO, Exxon, Gulf, Mobil, Shell, Standard of California, Standard of Indiana, and Texaco are respondents in the *Exxon* case, FTC Docket No. 8934, while General Mills is a respondent in the *Kellogg* case, FTC Docket No. 8883.

identify the consequences that would flow from a finding that the nine companies' contention is meritorious. First, the potential jeopardy of procedural rights in the adjudicative proceedings cannot impinge upon the FTC's right to collect the information in question, only upon the use to which that information might be put. Any other conclusion would suggest a blanket immunity from special reports orders for any company engaged in an adjudicative proceeding before the Commission. Such a determination would unreasonably restrict the FTC's legitimate information-gathering activities. Second, the corporate parties' claim, if valid, does not require sequestration of the LB and CPR data from complaint counsel in the *Exxon* and *Kellogg* proceedings. Unsurprisingly, there has been no suggestion of bad faith or that the LB and CPR programs have been developed for the partial purpose of providing indirect discovery for FTC complaint counsel in these proceedings. There has been no evidence to suggest that present complaint counsel intend or even wish to use the LB and CPR data in these adjudications.[54] The court concludes that a sequestration order therefore would be premature at this time; the nine corporate parties have not demonstrated an intent by complaint counsel to use the LB and CPR data that could trigger the relevant inquiry.

More important, the court is reluctant to enter the discovery phases of the *Exxon* and *Kellogg* proceedings. The respondents in those proceedings can raise before the Administrative Law Judge their contentions as to use of LB and CPR data should that issue in fact arise. The ALJs are intimately familiar with those cases and the scope of discovery authorized. Should violations of the discovery orders or of the FTC's procedural rules be alleged, the ALJs would be in the best position to determine that claim. If data obtained from the LB and CPR reports is offered in evidence in those cases, the corporate parties will have the opportunity to object to the introduction of such evidence. And if the corporate parties suspect that LB and CPR data has provided leads for the development of evidence offered, they again will have the opportunity to object to the tainted evidence before the ALJs. *See Atlantic Richfield Co. v. Federal Trade Commission,* 546 F.2d 646 at 651 (5th Cir. 1977). That the ALJ in *Exxon* has firm control of discovery matters is evidenced by his discovery order of November 11, 1976, limiting the discovery to be permitted complaint counsel. The court thus will not entertain the nine companies' arguments before the ALJs have a chance to rule on these issues, should such a ruling ever become necessary.[55]

Moreover, the corporate parties could seek additional review of any alleged improper use of the LB and CPR data before the Commission itself. And if a cease and desist order is entered, these respondents would be entitled to judicial review. 15 U.S.C. § 45(c). In view of this well-defined avenue of review—ALJ to Commission to court—for claims of improper discovery, and in light of the fact that the threatened harms may never occur, the court declines to weigh the merits of the corporate parties' procedural hazards claim at this time on the ground that it is raised prematurely.

## VII. Relevance and Burden

 The corporate parties have challenged the FTC's use of compulsory process in the LB and CPR orders on grounds of lack of reasonable relevance and undue burden.[56] The court considers these claims in a

---

54. Indeed, such a suggestion would appear absurd in the *Kellogg* case, as the parties have indicated the evidence on which they intend to rely and the evidentiary hearing already has begun.

55. The corporate parties have based some of their arguments on a misconception of the ALJ's power to fashion an appropriate remedy for improper use of the data. It is true that ALJs cannot issue section 6(b) orders, but it hardly follows that they are without power to exclude from evidence the information gathered from a section 6(b) investigation as improperly discovered. *See Horizon Corp.,* FTC Doc. No. 9017, July 28, 1976, at 2.

56. These challenges are made apart from the corporate parties' claims of arbitrary and capricious agency action under 5 U.S.C. § 706(2),

somewhat unusual posture; only the FTC, and not the corporate parties, has moved for summary judgment on this issue. The corporate parties contend that there exist genuine issues of material fact making the entry of summary judgment on this question premature as to either side. They suggest further discovery and evidentiary procedures before the court rules on relevance and burden. The FTC, of course, suggests that the question is ripe for disposition at this time.

## A. *Reasonable Relevance*

 The FTC's investigation and special reports orders must meet a standard of reasonable relevance: the information sought must be "reasonably relevant" to the general purposes of the investigation. *United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 94 L.Ed. 401 (1950); *Federal Trade Commission v. Texaco, Inc.*, 555 F.2d 862 at 873–874 & n.23 (D.C.Cir. 1977) (en banc). The corporate parties make only an indirect challenge to relevance in this instance. In the LB program, the corporate parties suggest a lack of reasonable relationship between the purposes of the program and the data sought to be collected, while in the CPR program the corporate parties stress the unsuitability of Census-type data for the FTC's purpose. It appears, however, that the corporate parties characterize these arguments as relating to the undue burden question.[57] Therefore, the court similarly will consider the arguments in the context of the undue burden inquiry. Thus the corporate parties have not pointed out, and the court cannot identify, any direct relevance objection to the LB and CPR orders. It seems clear to the

court that the orders are reasonably relevant to the general purposes of the LB and CPR programs: collection of financial information from certain large corporations. It is further clear that the court should interpret broadly the standard of reasonable relevance. *See FTC v. Texaco, supra,* at 874–875 (and cases cited therein).

## B. *Undue Burden*

The corporate parties also argue against enforcement of the FTC's compulsory process on the ground that the compliance burden is undue for the LB and CPR orders, making those orders unreasonable. Because the factual circumstances differ between the LB and CPR programs, the court will consider them separately.

(1) *LB Program:* The corporate parties suggest that the burden of complying with the LB orders would be undue for several reasons. The first of these reasons stems from the alleged lack of reasonable relationship between the stated purposes of the LB program and the data sought to be collected. The corporate parties' theory is that the absolute costs of compliance must be weighed against the suitability of the information sought for the stated purposes of the inquiry.[58] Identifying the Commission's purpose in the LB program as the development of "good market performance data" for antitrust and resource allocation purposes, the corporate parties suggest that the LB data is entirely unsuited for these purposes because of four deficiencies: (1) individual company LB data and published LB data aggregates would be noncomparable; (2) the LB aggregates to be published would not bear any reasonable relationship

and they should be evaluated under essentially the same standards employed in determining enforcement of an agency subpoena. *See, e. g., Oklahoma Press Publ. Co. v. Walling,* 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946). The court does not accept the corporate parties' contention that this case should be determined on different standards because statistical reporting programs are at issue.

**57.** *See* Outline and Explanation of Corporate Parties Concerning Necessary Evidentiary Procedures.

**58.** The corporate parties cite *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946), and *FTC v. American Tobacco Co.,* 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696 (1924), for that proposition. The court does not so liberally read those cases, though it agrees that an information request could be unreasonable and thus an undue burden if wholly irrelevant to the general purpose of the investigation. *See Morton Salt, supra.*

to economic data; (3) the LB aggregates to be published would not bear any reasonable relationship to market data; and (4) the LB aggregates to be published would be unreliable because of contamination caused by arbitrary and improper assignment to LB categories on a primary activity basis.

The court disagrees with the corporate parties that such a wide-ranging inquiry into suitability is required in an undue burden challenge to the FTC's use of compulsory process.[59] The corporate parties do not go so far as to allege that the data to be collected is useless, and the data certainly appears to have some utility. The court is of the opinion that the corporate parties' argument must be limited to a claim of undue burden in the sense of cost of compliance when, as here, "the agency inquiry is pursuant to a lawful purpose and the requested documents are relevant to that purpose." *FTC v. Texaco, supra,* at 882.

The corporate parties also hint that the cost of compliance with the LB program would be staggering. They contend that the program would require many companies to develop new accounting and reporting systems to generate and retrieve the data. At oral hearing, counsel for the corporate parties estimated the cost of compliance for some companies at "millions" of dollars. The FTC, on the other hand, has estimated the average compliance cost for the 1974 form to be $24,000, with a range from under $10,000 for some companies to $75,000–$100,000 for certain large conglomerates. The FTC asserts that company forecasts are inflated in light of the fact that certain estimates are permitted on the form; the FTC's own figures assume use of such estimates.

The court has some doubts that the corporate parties will show sufficient burden to justify this court's refusal to enforce the LB orders. Common sense suggests compliance estimates of "millions" of dollars to be inflated. Since the LB orders are directed at many of the largest companies in this country, moreover, the corporate parties face an uphill battle showing that compliance "threatens to unduly disrupt or seriously hinder normal operations of a business." *FTC v. Texaco, supra,* at 882. Many companies already have filed the LB form. Nevertheless, the record before the court is not sufficiently complete at this time to permit the court to resolve this question now.[60] Therefore the court will permit the corporate parties to submit additional affidavits on the issue of cost of compliance and permit the FTC to submit counter-affidavits.[61] In the court's view, no live testimony will be necessary at this time. Therefore the court will defer a decision on the corporate parties' cost of compliance challenge to the LB orders.

(2) *CPR Program:* The corporate parties have not elucidated as precisely their challenge to the CPR program on the ground of undue burden.[62] They do charge that the Census-type data that the CPR program would collect is unsuited for any purpose other than publishing aggregates. To the extent that this contention includes

59. The court believes, however, that a limited inquiry into suitability may be appropriate in determining the corporate parties' claim that the FTC acted arbitrarily in implementing the LB program.

60. The record contains only affidavits submitted to the Commission and to Judge Schwartz in Delaware. The FTC strenuously contends that the corporate parties were obliged to submit affidavits in this case in order to oppose its motion for summary judgment. The corporate parties, however, rely on this court's July 30, 1976 order and their submission of a memorandum detailing needed discovery and evidentiary procedures as excusing the need to oppose the Commission's motion with affidavits.

61. The court will limit the submission to five affidavits. The corporate parties have suggested that the financial representatives of a "small number" of the corporate parties could lay an adequate evidentiary foundation on this question if live testimony were presented. The court believes the same preliminary evidentiary foundation can be laid by means of affidavit.

62. The corporate parties claim that the Commission is responsible for this state of affairs, it having developed and implemented the CPR program in the dark.

the further claim that the compliance burden thus would be undue, the court finds the issue directly analogous to that discussed with respect to the LB program, *supra*. No sophisticated suitability analysis is required to determine the undue burden issue.

On the question of cost of compliance, the record again is somewhat incomplete. No affidavits were submitted to this court, although the record contains affidavits submitted to the FTC, the district court in Delaware, and the district court in the Southern District of New York. The corporate parties clearly do not claim as great a compliance burden for the CPR form as they do for the LB form, although they do contend that FTC estimates of cost of compliance are based on the use of Census data. While the court again considers it unlikely, on the basis of the evidence presently in the record, that the corporate parties will be able to make a sufficient showing of undue burden, it will permit them the opportunity to do so through submission of no more than five affidavits on the issue of compliance cost. The FTC will be permitted to submit counter-affidavits.

Accordingly, the only issue left to be resolved in the corporate parties' challenge to the Commission's use of compulsory process in the LB and CPR orders is whether the cost of compliance makes enforcement of the orders unreasonable because of undue burden. The court finds no genuine issues of material fact with respect to other claims of the corporate parties and finds the Commission's position correct as a matter of law.

### VIII. Arbitrary and Capricious Issues

The corporate parties contend that the adoption and implementation of the LB and CPR programs by the FTC was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the dictates of 5 U.S.C. § 706(2). The FTC has moved for summary judgment on the arbitrary and capricious issues, while the corporate parties believe these questions unripe for disposition because material factual issues remain.

A threshold question arises. The corporate parties have argued throughout that the LB and CPR programs constitute rulemaking. If that were true, even the FTC would concede that its actions constituted "agency action" within the meaning of section 706(2) and thus were subject to review under that section. *See* 5 U.S.C. §§ 701(b)(2), 551(13). The court has rejected the corporate parties' rulemaking claim, however, and the question is presented whether the FTC's action constitutes "agency action" under section 706(2). Although the court has been the beneficiary of hundreds of pages of legal memoranda in these actions, this narrow legal question has not been specifically addressed. The court believes that it could benefit from short memoranda on this question before deciding the FTC's motion for summary judgment on the arbitrary and capricious issues. The memoranda should not exceed ten pages in length and will be submitted simultaneously by both sides. No responses will be permitted, and nor oral argument is necessary.

The court therefore will defer consideration of the FTC's motion as to these issues until it receives and considers the supplemental memoranda on the applicability of section 706(2) in light of this court's ruling on the rulemaking claim.