**SHELL OIL COMPANY, Texaco, Inc., Phillips Petroleum Company, Coastal States Gas Corporation and Gulf Oil Corporation, Plaintiffs,**

**Mobil Corporation, Union Oil Company of California and Continental Oil Company, Intervenors-Plaintiffs,**

v.

**The DEPARTMENT OF ENERGY, James R. Schlesinger, Secretary, Department of Energy, the Energy Information Administration, Lincoln E. Moses, Administrator, Energy Information Administration, the Office of Management and Budget, James T. McIntyre, Jr., Director, Office of Management and Budget, Defendants.**

Civ. A. No. 79–134.

United States District Court, D. Delaware.

Aug. 17, 1979.

Stuart E. Schiffer, Acting Asst. Atty. Gen., C. Max Vassanelli, Mark C. Rutzick and Surell Brady, U.S. Dept. of Justice, William D. Luck, U.S. Dept. of Energy, Richard M. Irby, Washington, D.C., James W. Garvin, Jr., U.S. Atty., John X. Denney, Jr., Asst. U.S. Atty., Wilmington, Del., for defendants.

Thomas Herlihy, III, of Herlihy & Herlihy, Wilmington, Del., J. Wallace Adair, Roger C. Simmons, Stuart H. Harris and Marcia D. Welsch, of Howrey & Simon, Washington, D.C., for plaintiffs and intervenors-plaintiffs.

## OPINION

STAPLETON, District Judge:

### I. THE BACKGROUND.

This suit is a challenge by eight major energy-producing companies [1] to an order of the Administrator of the Energy Information Administration ("EIA") of the Department of Energy ("DOE") directing that a group of 27 such companies file Form EIA–28, a report on company financial and operational data for calendar years 1977 and 1978.[2] Form EIA–28 is the first phase of the Financial Reporting System ("FRS"), which was mandated by Congress in Section 205(h) of the Department of Energy Organization Act ("DOE Act"), 42 U.S.C. § 7135 (Supp.1977).

On June 16, 1978, after a lengthy period of development, pre-testing and consultation both within and outside the government, the EIA submitted to the Office of Management and Budget ("OMB") a proposed FRS report form. This submission was made pursuant to the Federal Reports Act, 44 U.S.C. § 3501, *et seq.* (1976). On July 17, 1978, the EIA and OMB held a joint public hearing on the subject of the proposed FRS report. *See* 43 Fed.Reg. 27056 (June 22, 1978). On October 10, 1978, OMB Director James T. McIntyre, Jr. issued his approval of the FRS report in a letter of that date to Secretary of Energy James R. Schlesinger. Administrative Record ("A.R."), Volume I, pp. 255–61. The approval was subject to a series of modifications and limitations and was limited to collection of FRS data for calendar years 1977 and 1978 only. *Ibid.*

Subsequent to that approval, the EIA distributed final copies of the approved FRS report to each of the 27 reporting companies on October 20, 1978. These forms were accompanied by a set of instructions and a statement indicating the criteria the EIA intended to use in disseminating data received on FRS reports. These criteria permit disclosures to the Department of Justice ("DOJ"), the Federal Trade Commission ("FTC"), the Secretary of the Interior, and the Comptroller General in accordance with the following "guidelines":

1. EIA will provide disaggregated [i. e. company identifiable] EIA–28 data to a named agency in response to a written request from it which meets the following conditions:

(a) Contains a statement that the data requested is necessary to the requesting agency in carrying out its lawful duties and responsibilities.

(b) contains an undertaking not to disseminate or disclose the disaggregated information provided by EIA outside the named agency except for disclosures determined by the named agency to be made (i) in connection with proceedings in which the named agency is or might be involved, (ii) in response to a Freedom of Information Act request, or (iii) in response to a written request from the General Accounting Office or from the Congress or any Committee of the Congress having jurisdiction.

(c) contains an undertaking that in responding to a Freedom of Information Act request encompassing disaggregated data obtained from EIA, the named agency (i) will not make a discretionary release of any disaggregated information obtained from EIA which is exempt from mandatory disclosure under the Freedom of Information Act and (ii) will consult with and give great deference to the views of EIA in determining whether any information obtained from EIA falls within

---

1. The plaintiffs in this action are Shell Oil Company, Texaco, Inc., Phillips Petroleum Company, Coastal States Gas Corporation and Gulf Oil Corporation. In addition, Mobil Corporation, Union Oil Company of California and Continental Oil Company are intervenor-plaintiffs herein. All of these companies are referred to hereafter as "plaintiffs".

2. This Court has jurisdiction over the subject matter of this controversy under 28 U.S.C. § 1331. *See Chrysler Corporation v. Brown,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979).

the exemptions from mandatory disclosure; provided, however, that where the pertinent regulations of the named agency authorize the referral of Freedom of Information Act requests for records originating in another agency to that agency, the named agency shall refer any requests for EIA data to EIA for response.

(d) contains an undertaking that prior to disclosing any disaggregated data received from EIA in any manner outside the named agency, the named agency shall give EIA and the originator of such data ten days written notice of the proposed disclosure.

2. Prior to honoring a request from a named agency for access to disaggregated EIA–28 data, EIA will give the originator of such data ten days written notice before making the data available.

44 Fed.Reg. 2760 (January 12, 1979).

The report, instructions and guidelines were subsequently published in the *Federal Register* on January 12, 1979. 44 Fed.Reg. 2758. The original filing deadline for the 1977 FRS report was February 1, 1979, but at the request of the reporting companies that deadline was set back to April 1, 1979.

On March 15, 1979, plaintiffs filed this action. While many discrete claims are asserted in the complaint, its primary theme is that the development of the FRS report was improperly influenced by the Department of Justice and the Federal Trade Commission and that the end product is designed not for the primary purpose of securing data necessary for energy policy formulation but rather for the primary purpose of eliciting information useful to the DOJ and the FTC in fulfilling their responsibilities with respect to the antitrust laws.

The plaintiffs attack on three fronts. They challenge (1) the EIA's promulgation of the FRS report, (2) the OMB's clearance of the FRS report, and (3) the EIA's decision to share disaggregated FRS data with other federal agencies. The parties have

filed cross-motions for summary judgment which encompass each of these attacks. Each will be analyzed in turn. A working knowledge of the patchwork pattern of relevant legislation is a necessary prerequisite to any such analysis, however.

## II. THE STATUTORY SETTING.

### A. *Statutes of General Applicability.*

1. *The Trade Secrets Act, 18 U.S.C. § 1905.*

This Act makes it a crime for any officer or employee of the United States to disclose any information relating to "trade secrets", "confidential statistical data", or other proprietary information,[3] other than as "authorized by law". Read literally, the Act prohibits unauthorized disclosures within the government, as well as disclosures to the public. While a number of opinions of the Attorney General have suggested, largely based on practical considerations, that this section was not intended to apply to inter-agency transfers of proprietary information, *no court appears to have so held.*

2. *The Federal Reports Act, 44 U.S.C. § 3501, et seq.*

The Federal Reports Act, enacted in 1942, establishes a policy against duplication of information gathering efforts by federal agencies and, as a corollary, a policy in favor of inter-agency exchange of information. "Information" is defined for purposes of the Act as "facts obtained . . . by the use of . . . report forms, . . . questionnaires, or similar methods calling either for answers to identical questions from ten or more persons" or for answers to certain types of questions from federal employees. 44 U.S.C. § 3502. In furtherance of these policies, the Act requires clearance of governmental requests for information by either the OMB or the Comptroller General. The Act specifically directs "all agencies . . . to cooperate to the fullest practicable extent at all times in making information available to other agencies." 44 U.S.C. § 3507.

---

**3.** In addition to trade secrets and confidential statistical data, the Act also protects proprietary information relating to "processes, operations, style of work" or the "amount or source of any income, profits, losses or expenditures of any person" or firm.

■ The Act expressly addresses the problem of inter-agency exchange of confidential information. 44 U.S.C. § 3508. First, it assures that confidential information will have no less protection in the hands of a receiving agency than it had in the hands of the forwarding agency by providing that officers and employees of the receiving agency shall be subject not only to any restrictions on disclosure applicable to their own agency, but also to any restrictions upon disclosure applicable to the forwarding agency. Among other things, this means that data immune from public disclosure in the hands of a federal agency acquiring data retains that protection in the hands of a receiving agency after an inter-agency transfer. 44 U.S.C. § 3508(a).

■■ The Act goes on to establish standards governing certain inter-agency transfers of confidential information. Under Subsection 3508(b), a "Federal agency", as defined in the Act,[4] retains discretion to pass on to any other "Federal agency" any information which, "at the time of collection" was not "declared . . . to be confidential" by it.[5] Thus, if it seems to the acquiring agency that the advantages of cooperation with other agencies are outweighed by the risk of uncooperativeness on the part of those from whom the information will be sought, it may declare that the information will be received on a confidential basis. Otherwise, the Act imposes no restriction on the acquiring agency's power to disclose to another agency. Even where information is obtained on a confidential basis, it may still be disclosed to another federal agency under the Act, (a) in the form of statistical totals or summaries, (b) with the consent of the person from whom it was obtained, or (c) when the receiving agency is authorized to compel disclosure of the same information. 44 U.S.C. § 3508(b).

Contrary to the contention of the plaintiffs in this case, Section 3508(b) does not protect all information which might be characterized by a court as confidential. The crucial question under that section is whether the information at issue was *declared* confidential by the collecting agency *at the time of collection* and thus was acquired on a confidential basis.

### B. *Energy Statutes.*

1. *The Federal Energy Administration Act, 15 U.S.C. § 761, et seq. ("FEA Act").*

This Act, passed in May of 1974, created the Federal Energy Administration ("FEA"). The Administrator of that Administration was granted broad information gathering power. In particular, he was directed to "collect . . . and analyze energy information by categorical grouping . . . of sufficient comprehensiveness and particularity to permit fully informed monitoring and policy guidance with respect to the exercise of his functions under" the Act. 15 U.S.C. § 772(a). One of the Administrator's functions under the Act was to "promote free and open competition in all aspects of the energy field, prevent unreasonable profits within the various segments of the energy industry and promote free enterprise". 15 U.S.C. § 764(b)(5).

The Administrator's information gathering authority included the right to "require, by general or special orders, any person engaged in any phase of energy supply or major energy consumption to file with the Administrator in such form as he may prescribe, reports or answers in writing to such specific questions, surveys or questionnaires as may be necessary to enable the Administrator to carry out his functions under" the Act. 15 U.S.C.A. § 772(c).

---

4. Since 1973 the Act has defined "Federal agency" to exclude the GAO and "independent Federal regulatory agencies" like the FTC. The primary purpose of the amendment in that year was to transfer clearance authority for information sought by those agencies to the Comptroller General and most of the provisions of the original Act remain applicable to them. *See* H.R.Conf.Rep.No.624, 93d Cong., 1st Sess.,

*reprinted in* [1973] U.S.Code Cong. & Admin. News, pp. 2523, 2533–2534. For a reason not reflected in the legislative history, the amended Act makes independent regulatory agencies subject to the provisions of Section 3508(a) but not the provisions of Section 3508(b).

5. Or by a "superior authority".

The Comptroller General was given the responsibility of monitoring and evaluating the operations of the FEA, including the Administrator's information gathering activities. In order to carry out this responsibility, the Comptroller General was given "access to such data within the possession or control of the Administration from any public or private source whatever, notwithstanding the provisions of any other law." 15 U.S.C. § 771(a). In addition, the Comptroller may request, and in limited instances compel disclosure of, information possessed by persons engaged in any phase of energy supply or consumption if that information "relates to the purposes of . . . [the Act] including, but not limited to, energy costs, demand, supply, industry structure, and environmental impacts." 15 U.S.C. § 771(b).

The FEA Act contains two references to the Trade Secrets Act. First, Section 771(f) provides in part as follows:

The Comptroller General may not disclose to the public any information which concerns or relates to a trade secret or other matter referred to in . . . [the Trade Secrets Act], except that such information shall be disclosed by the Comptroller General or the Administrator, in a manner designed to preserve its confidentiality—

(1) to other Federal Government departments, agencies, and officials for official use upon request;

(2) to committees of Congress upon request; and

(3) to a court in any judicial proceeding under court order.

The second provision referring to the Trade Secrets Act comes in the context of a section dealing with the disclosure of information to the public. It provides:

Subject to the provisions of this . . [Act, the Freedom of Information Act] shall apply to public disclosure of information by the Administrator: *Provided,* That notwithstanding said section, the provisions of . . . [the Trade Secrets Act], or any other provision of law, . . . all matters reported to, or oth-

erwise obtained by, any person exercising authority under this chapter containing trade secrets or other matter referred to in . . . [the Trade Secrets Act] may be disclosed to other persons authorized to perform functions under this chapter solely to carry out the purposes of the chapter, or when relevant in any proceeding under this [Act].

15 U.S.C. § 773(b).

In August of 1976, Congress added a subchapter II to the Act which established an Office of Energy Information and Analysis headed by a Director who was to establish a "National Energy Information System". 15 U.S.C. § 790a. This System was to contain all information concerning energy supply and consumption necessary in order to meet the needs of the FEA, the Congress, and "other officers and employees of the United States in whom have been vested, or to whom have been delegated, energy-related policy decisionmaking responsibilities". *Ibid.*

Specifically to be included was such energy information as required "to define and permit analysis of . . . the institutional structure of the energy supply system, including patterns of ownership and control of mineral fuel and nonmineral energy resources and the production, distribution, and marketing of mineral fuels and electricity." 15 U.S.C. § 790a(b).

In addition to collecting data, the Director was also charged with the responsibility of reviewing "the energy information gathering activities of Federal agencies with a view toward avoiding duplication of effort and minimizing the compliance burden on business enterprises and other persons". He was to "recommend policies which, to the greatest extent practicable . . . provide adequately for the energy information needs of the various departments and agencies of the Federal Government, the Congress, and the public." 15 U.S.C. § 790e. In furtherance of the policy of inter-agency cooperation and information sharing, the Director was expressly granted access to energy information in the possession of any federal agency except in

those situations where the disclosure would be expressly prohibited by law or where the other agency determined that disclosure would significantly impair the discharge of its responsibilities. 15 U.S.C. § 790g.

2. *The Energy Supply and Environmental Coordination Act, 15 U.S.C. § 791, et seq. ("ESECA").*

The ESECA, enacted in June of 1974, also confers broad information gathering authority on the FEA Administrator. He is authorized to "collect such energy information as he determines to be necessary to assist in the formulation of energy policy or to carry out the purposes of [the ESECA] or the Emergency Petroleum Allocation Act of 1973". The term "energy information" in this context is defined by the Act to include "(A) all information in whatever form on (i) fuel reserves, exploration, extraction, and energy resources . . . wherever located; (ii) production, distribution and consumption of energy and fuels wherever carried on; and (B) matters relating to energy and fuels such as corporate structure and proprietary relationships, costs, prices, capital investment, and assets, and other matters directly related thereto, wherever they exist". 15 U.S.C. § 796(a) and (e). It is thus apparent that the information gathering powers of the Administrator under the FEA Act and the ESECA overlap to a considerable degree. The ESECA expressly provides that the information gathering authority conferred by it is "not limited by, and not in limitation of, any other authority of the Federal Energy Administrator".

The ESECA contains the following provision with respect to confidential energy information:

> (d) Upon a showing satisfactory to the Federal Energy Administrator by any person that any energy information obtained under this section from such person would, if made public, divulge methods or processes entitled to protection as trade secrets or other proprietary information of such person, such information, or portion thereof, shall be confidential in accordance with the provisions of

. . . [the Trade Secrets Act] except that such information, or part thereof, shall not be deemed confidential for purposes of disclosure, upon request, to (1) any delegate of the Federal Energy Administrator for the purpose of carrying out . . . [the ESECA] and the Emergency Petroleum Allocation Act of 1973, (2) the Attorney General, the Secretary of the Interior, the Federal Trade Commission, the Federal Power Commission, or the General Accounting Office, when necessary to carry out those agencies' duties and responsibilities under this and other statutes, and (3) the Congress, or any committee of Congress upon request of the Chairman.

15 U.S.C. § 796(d).

3. *The Nonnuclear Energy Research and Development Act, 42 U.S.C. § 5901, et seq. ("NERDA").*

This Act, passed in December of 1974, established an Energy Research and Development Administration which, as the name suggests, was intended to monitor and support research and development in the field of nonnuclear energy. The Administrator of this agency was directed to establish and maintain "a central source of information on all energy resources and technology in furtherance of the Administrator's research, development, and demonstration mission carried out directly or indirectly under" the Act. 42 U.S.C. § 5916. The Act goes on to provide as follows:

> The information maintained by the Administrator shall be made available to the public, subject to the provisions of [the Freedom of Information Act and the Trade Secrets Act] . . . , and to other Government agencies in a manner that will facilitate its dissemination: *Provided,* That upon a showing satisfactory to the Administrator by any person that any information, or portion thereof, obtained under this section by the Administrator directly or indirectly from such person, would, if made public, divulge (1) trade secrets or (2) other proprietary information of such person, the Administrator shall not disclose such information

and disclosure thereof shall be punishable under . . . [the Trade Secrets Act]: *Provided, further,* that the Administrator shall, upon request, provide such information to (A) any delegate of the Administrator for the purpose of carrying out this [Act] . . . , and (B) the Attorney General, the Secretary of Agriculture, the Secretary of the Interior, the Federal Trade Commission, the Federal Energy Administration, the Environmental Protection Agency, the Federal Power Commission, the General Accounting Office, other Federal agencies, when necessary to carry out their duties and responsibilities under this chapter and other statutes, but such agencies and agency heads shall not release such information to the public.

4. *The Department of Energy Act, 42 U.S.C. § 7101, et seq. ("the DOE Act").*

The DOE Act, passed in the Summer of 1977, established a Department of Energy under a Cabinet level Secretary. Among its responsibilities were the duties "to continue and improve the effectiveness and objectivity of a central energy data collection and analysis program" and "to foster and assure competition among parties engaged in the supply of energy and fuels". 42 U.S.C. § 7112(7), (12). In order to assist the Secretary in carrying out these functions the Act establishes the EIA. The Administrator of the EIA is charged with the responsibility "for carrying out a central, comprehensive, and unified energy data information program which will collect, evaluate, assemble, analyze, and disseminate data and information which is relevant to energy resource reserves, energy production, demand, and technology, and related economic and statistical information, . . ." 42 U.S.C. § 7135(a)(2). The Act further directs that the Secretary delegate to the Administrator the functions vested in him relating to the gathering and analysis and dissemination of energy information, as that term is defined in the ESECA. 42 U.S.C. § 7135(b). These energy information functions include those previously vested in the Administrator of the FEA under the FEA Act and the ESECA and in the Administrator of the Energy Research and Development Administration under the ERDA. In addition the Administrator is directed to perform all of the functions previously assigned to the Director of the Office of Energy Information and Analysis. 42 U.S.C. § 7135(b), (c).

In addition to the collection and analysis authority conferred upon the Administrator of the EIA directly and through delegation from the Secretary, he is ordered to implement a financial reporting system for major energy producing companies. 42 U.S.C. § 7135(h). He is specifically directed to produce a format for an energy producing company financial report for use during the second full calendar year following the effective date of the Act. The following portion of Section 205(h) of the Act designates the kind of information which this report shall elicit:

. . . Such report shall be designed to allow comparison on a uniform and standardized basis among energy-producing companies and shall permit for the energy-related activities of such companies—

(A) an evaluation of company revenues, profits, cash flow, and investments in total, for the energy-related lines of commerce in which such company is engaged and for all significant energy-related functions within such company;

(B) an analysis of the competitive structure of sectors and functional groupings within the energy industry;

(C) the segregation of energy information, including financial information, describing company operations by energy source and geographic area;

(D) the determination of costs associated with exploration, development, production, processing, transportation, and marketing and other significant energy-related functions within such company; and

(E) such other analyses or evaluations as the Administrator finds is nec-

essary to achieve the purposes of this chapter.

42 U.S.C. § 7135(h)(2).

The DOE Act mandates disclosure of all EIA information to all segments of the DOE, upon request. 42 U.S.C. § 7135(f). It also directs that such information shall be promptly made available to the public unless it is subject to an exemption from mandatory disclosure under the Freedom of Information Act ("FOIA"). In addition, the Act specifies that the above-quoted sections of the ESECA and the NERDA pertaining to disclosures "shall continue to apply to any information obtained by the Administrator under such provisions". 42 U.S.C. § 7135(g). Finally, the provision mandating the FRS program specifies that "the provisions of . . . [the Trade Secrets Act] shall apply in accordance with its terms to any information obtained by the Administration pursuant to this subsection. 42 U.S.C. § 7135(h)(7).

### III. FORMULATION AND PROMULGATION OF EIA–28.

#### A. *Reviewability.*

Plaintiffs attack the manner in which the EIA developed and promulgated EIA–28 on a variety of grounds. First, they assert, the EIA, at the behest principally of the DOJ and the FTC, converted the FRS from an energy policy planning instrument to an antitrust enforcement tool and the EIA's information gathering authority is thus being used for an "improper" or "bad" purpose. Second, plaintiffs contend that even if I fail to find that the evolution of the FRS was pervaded by an improper purpose, I must nonetheless strike it down because it asks for antitrust information not intended by Congress to be captured by the FRS. Third, plaintiffs claim that the FRS fails to provide corporate respondents with adequate notice of the existence, nature and scope of the antitrust investigations for which particular information is sought. Fourth, they maintain that the requirement that they furnish the EIA with antitrust

information under the FRS, when combined with the EIA's announced intention to provide that information to other agencies of federal government,[6] violates their procedural rights under a number of statutes including the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.* (1977) ("APA"), Antitrust Civil Process Act, 15 U.S.C. § 1311, *et seq.* (1974), and Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 41, *et seq.* (1973). Finally, plaintiffs charge that the EIA's decision to promulgate the FRS was arbitrary and capricious and, accordingly, cannot be sustained.

Defendants take issue with each of plaintiffs' assertions. Preliminarily, however, they assert that the promulgation of EIA–28 was agency action "committed to agency discretion by law" and is, therefore, not subject to judicial review. I address this issue first.

Final agency action is subject to review under the APA "except to the extent that —. . . (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). The Supreme Court has stated that judicial review of agency action is the rule, nonreviewability the exception, and that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967), quoting *Rusk v. Cort*, 369 U.S. 367, 379–80, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962). The Court has also stressed the narrowness of the "committed to agency discretion" exception, stating that it is "applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' S.Rep.No.752, 79th Cong. 1st Sess., 26 (1945)." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971). Courts have frequently found no law to apply when the challenged administrative action has involved application of highly technical expertise to a statutory mandate which affords the decisionmaker broad discretion.

---

6. 44 Fed.Reg. 2758, 2760 (January 12, 1979).

*See, e. g., Panama Canal Co. v. Grace Line, Inc.,* 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958); *Local 2855, AFGE v. United States,* 602 F.2d 574 (3 Cir. 1979).

Defendants argue that this is such a case. The conclusion that "the content, organization, and particular data-element requirements" of the FRS are matters "committed to agency discretion", they say, "necessarily follows from the highly technical nature of the task of constructing a statistical report designed to" capture energy policy planning information. Defendants' Brief at 64–65. Thus, defendants assert, this Court has no law to apply to determine the utility of the FRS in accomplishing its statutory mandate. "There is simply no meaningful way", it is said, "in which this Court can examine a single element, column or schedule of the FRS report and determine if the inclusion of such items in the report was a proper exercise of the Administrator's discretion." *Id.* at 66.

 It is unnecessary to pass upon this argument because it simply misses the point of plaintiffs' challenge to the FRS. Significantly, plaintiffs have not objected to particular data-element requests. They have claimed, not that designated questions should have been drafted in a different manner, but that the information requested exceeds EIA's statutory mandate and violates their constitutional and statutory rights. These are claims as to which there clearly is "law to apply". The fact, then, that the construction of particular data-element requests may be "committed to agency discretion" is irrelevant. As the Third Circuit Court of Appeals has recently stated,

> Even when a court ascertains that a matter has been committed to agency discretion by law, it may entertain charges that the agency lacked jurisdiction, that the agency's decision was occasioned by im-

permissible influences, such as fraud or bribery, or that the decision violates a constitutional, statutory or regulatory command. For the APA circumscribes judicial review only *"to the extent that . . . agency action is committed to agency discretion by law;"* it does not foreclose judicial inquiry altogether.

*Local 2855, AFGE v. United States, supra,* at 580 (footnote omitted) (emphasis in original). Plaintiffs' challenges to the FRS report are, therefore, amenable to judicial review.

### B. *The Merits.*

While the plaintiffs' one hundred page statement of the facts uses more colorful vocabulary in describing the activities of the EIA, the DOJ and the FTC than the defendants are willing to accept, the relevant facts are not in dispute. Beginning in the Spring of 1977, the FRS staff solicited the suggestions of several federal agencies with respect to the design and content of the FRS report form. DOJ and FTC officials participated actively over a significant period of time in making suggestions for modification of the then existing, proposed FRS report form. Among the purposes of these suggestions was to obtain information relevant to the antitrust responsibilities of the DOJ and the FTC. While the EIA made the ultimate decisions regarding the design and content of the report form and declined to adopt a number of suggestions vigorously pressed by the DOJ and FTC,[7] many of the suggestions of these agencies were incorporated in the final version of the report form, and to this extent, the form differs from what it would have been without the participation of the DOJ and FTC in its development. There is no dispute that the form, as ultimately promulgated, captures information about the respondents which would be relevant to an analysis of

---

7. In spite of the antitrust agencies' demands for information on profits divided between refining and marketing in the petroleum industry, for example, the FRS as ultimately adopted does not request such "split" data. Similarly, EIA–28 asks for coal reserves information with far less geographical breakdown than the DOJ and

FTC insisted was necessary for antitrust enforcement purposes. A scan of plaintiffs' four volume "factual analysis", which purports to link specific DOJ and FTC suggestions to changes subsequently held in the FRS by the EIA, suggests that over half of those suggestions were rejected *in toto* by the EIA.

whether there are or are not antitrust violations in various lines of commerce in the energy industry. Finally, it is clear that the EIA intends to share FRS data with the DOJ and FTC in accordance with the "guidelines" it has published in the Federal Register.

■ Plaintiffs correctly point out that compulsory process issued by an agency for an improper purpose will not be enforced by a court.[8] They then ask this Court to find that the primary purpose of EIA–28 is to secure "antitrust enforcement information", rather than "energy policy making data", and to declare that, having been promulgated primarily for an improper purpose, it is not authorized by law. Plaintiffs fail to bring their case within the scope of the legal principle relied upon, however.

■ Significantly, plaintiffs have failed to point out a single inquiry of EIA–28 which they maintain is not designed to elicit information having value for energy policy planning purposes. Undoubtedly, one reason for this is that no meaningful dichotomy can be drawn between energy planning data and information concerning the presence or absence of competition in the energy industry. As Congress has recognized in its energy legislation, antitrust information concerning the energy industry is energy planning data. Indeed, the short answer to plaintiffs' argument is that Congress intended FRS data to be utilized in ascertaining the presence or absence of competition in the energy industry and the use of FRS authority to collect data for that purpose is not a misuse or abuse of that authority.

The energy statutes summarized in the foregoing section clearly evidence the view of Congress that the presence or absence of competition in the energy industry is of crucial importance to energy planning and that the presence of competition is essential to attainment of the goals of that legislation. Indeed, Congress has commanded the Secretary to "promote free and open competition in all aspects of the energy field," 15 U.S.C. § 764(b)(5), and "to foster and assure competition among parties engaged in the supply of energy and fuels." 42 U.S.C. § 7112(12).

Given the central role of competition in the congressional view of the energy scene, it is not surprising that it required the collection of information which would be relevant to an analysis of the industry from an antitrust viewpoint. As previously noted, when Congress created the National Energy Information System, it declared that "at a minimum", it should contain sufficient information to permit analysis of "the institutional structure of the energy supply system including patterns of ownership and control of" energy resources, production, distribution and marketing. 15 U.S.C. § 790a(b).

Plaintiffs acknowledge this aspect of the National Energy Information System and the existence of other grants of authority clearly broad enough to cover the same subject matter. *E. g.*, 42 U.S.C. § 7135(b) and 15 U.S.C. § 796(a) and (e), (i). They argue, however, that these provisions contemplate "general" and "nationwide" data concerning competition and not the kind of "detailed" information elicited by EIA–28. This "detailed" information is concededly helpful in determining the presence or absence of competition in the energy industry, however, and given the congressional concern in this area it is difficult to conceive that it intended to withhold authority to obtain data of this kind.

Moreover, the plaintiffs' argument ignores the congressional FRS mandate itself. Congress, when it enacted the DOE Act, was concerned about the FEA's failure to achieve a satisfactory data base and went to considerable lengths to spell out what kind of information the FRS should secure.

---

**8.** See, e. g., *United States v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978); *Donaldson v. United States*, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971); *United States v. Powell*, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964); *Reisman v. Caplin*, 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964); *United States v. De Grosa*, 405 F.2d 926 (3 Cir.), *cert. denied*, 394 U.S. 973, 89 S.Ct. 1465, 22 L.Ed.2d 753 (1969); *United States v. Serubo*, 460 F.Supp. 689 (E.D.Pa.1978).

The program was to obtain such information on a company-by-company basis as would be sufficient to permit "analysis of the competitive structure of sectors and functional groupings within the energy industry". It was to include such comprehensive data as revenues, profits, cash flow, investments, and costs. And, finally, the data were to be sufficiently detailed as to permit allocation of costs among the various functions of the company and "the segregation of [the company's] energy information, including financial information, describing company operations by energy source and geographical area." 42 U.S.C. § 7135(h)(2).

In sum, my analysis of Congress's energy legislation leads me to conclude that insofar as EIA–28 solicits information relevant to the presence or absence of competition in the energy industry, it does not pursue an improper purpose and, indeed, is carrying out an express mandate of Congress. It follows that, absent some other impediment, the EIA is entitled to the data it seeks. Plaintiffs' argument to the contrary is not the same as that sustained in the "improper purpose" or "bad faith" line of cases on which they rely. Since Congress intended FRS data to be used to determine the presence or absence of competition in the energy industry, this is not a case where the intended use of information sought by compulsory process is a use not contemplated by Congress when it authorized that process. Plaintiffs' "improper purpose" argument is thus, in reality, not an argument that something is going to happen which Congress did not intend, but rather an argument that the collection and analysis which Congress in fact intended to occur should not occur because experts employed by agencies other than the EIA played a role in the collection process and may also conduct the intended analysis. No case cited by plaintiffs supports this argument.

■ While plaintiffs' reply brief asserts that Congress intended to bar the EIA from consulting with the DOJ and FTC, the only support they can marshal for this assertion is a reference to statutory provisions *requiring* the EIA to consult with specified agencies about specified matters. I decline to draw the negative inference which plaintiffs suggest, not only because the DOE Act expressly authorizes these three agencies to confer concerning their information needs,[9] but also because it is evident from Congress's concern for competition in the energy industry that it would not wish to bar the EIA from any available expertise.

■ Nor can I perceive any basis for holding that the EIA's intention of disclosing FRS data to the DOJ and the FTC should bar it from access to the information sought by EIA–28. First, as will appear hereafter, I find that Congress intended that the EIA would collect data for the benefit of the FTC and the DOJ and, accordingly, that there is nothing improper about its intending to do so. But even if the sharing of information with the DOJ and FTC had not been sanctioned by Congress, I would be unable to accept plaintiffs' argument that a response to EIA–28 should not be compelled. The rationale of the "improper purpose" or "bad faith" line of cases relied upon by plaintiffs is simply inapplicable where, as here, refusal to enforce agency process would frustrate fulfillment of the agency's proper function. As stressed earlier, Congress intended the EIA to collect and analyze data of the kind sought by EIA–28 and a court would not be justified in interfering with the execution of that intent even if it concluded there was a potential for subsequent misuse of the collected data. The problem in such a situation would not be with the collection of the data but with the subsequent misuse, and the remedy would be appropriately directed only against the subsequent misuse.

■ Wholly apart from their claim that EIA–28 was promulgated for an improper purpose, plaintiffs maintain that responding to EIA–28 would deprive them of rights secured by the Constitution, the APA, the FTC Act and Rules, and the Federal Rules of Civil Procedure. The rights referred to, however, are rights which

9. *See* 15 U.S.C. § 790e (1979 Supp.).

plaintiffs claim they would have in the context of a judicial or administrative proceeding initiated by the DOJ or FTC. The claimed injury in each instance thus arises not from reporting to the EIA, but rather from the use of FRS information in some possible future proceeding which may be instituted by the DOJ or FTC. We do not know at this point, however, what use the DOJ and FTC will make of FRS data and what proceedings, if any, will be instituted by them.[10] If a proceeding is forthcoming, I agree with the Court of Appeals for the District of Columbia, that the initial decision with respect to plaintiffs' rights and the use of FRS data should be for the agency or court presiding over that proceeding to make in the context of a concrete controversy. *FTC Line of Business Report Litigation,* 193 U.S.App.D.C. 300, 323, 595 F.2d 685, 708 (D.C.Cir. 1978); *see also Atlantic Richfield Co. v. FTC,* 546 F.2d 646, 651 (5 Cir. 1977).[11]

## IV. OMB CLEARANCE.

### A. *Reviewability.*

■ The Federal Reports Act, 44 U.S.C. § 3501, *et seq.,* as earlier noted, requires federal agencies attempting to collect information from ten or more respondents by use of an identical form to obtain clearance of the form from either the Director of the OMB or the Comptroller General, depending on the nature of the agency seeking the information. 44 U.S.C. §§ 3509, 3512. The Director of the OMB granted conditional clearance of the FRS report on October 10, 1978. Plaintiffs challenge that clearance on

a number of grounds. First, they claim that the EIA was required to obtain clearance of the FRS report from the General Accounting Office ("GAO"), rather than the OMB. Second, they assert that even if the OMB was empowered to clear the FRS report, it violated the Federal Reports Act and its own regulations by the manner in which it did so. Finally, they argue that improper influence of members of Congress and other federal agencies tainted the OMB's decision to clear the FRS.

■ Defendants maintain that the Court's power to address these arguments is limited because approval of an information form under the Federal Reports Act is a matter "committed to agency discretion" and thus unreviewable, and because, in any event, plaintiffs lack standing to challenge the OMB clearance on any ground. I conclude that the OMB's decision is reviewable and that plaintiffs have the requisite standing.

■ Once again, defendants' argument against judicial review is founded on an assertion that the controlling statute provides no criteria by which an exercise of agency discretion can be judged. Once again, defendants' argument is unpersuasive. As Judge Flannery of the District of Columbia[12] and Judge Schwartz[13] of this Court have observed in closely analogous situations, "The Federal Reports Act . . . clearly sets forth two criteria under which the [clearing official] . . . is to make his review: avoiding unnecessary duplication and minimizing compliance burden".[14]

---

10. Plaintiffs seek to draw a parallel between their case and those "improper purpose" cases involving agency or grand jury process designed to secure information for use in a pending or imminent criminal proceeding. There is no evidence in this record, however, of a pending or imminent criminal proceeding against any of the plaintiffs and plaintiffs' cases make it clear that the mere possibility that information sought by an agency may be used in a subsequent criminal prosecution will not bar enforcement of the agency process. *E. g., Donaldson v. United States,* 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971); *Venn v. United States,* 400 U.S. 207 (5 Cir. 1968).

11. Plaintiffs' argument that EIA–28 is arbitrary and capricious is primarily a restatement of their contention that the EIA is not authorized to collect antitrust information. Since I find that EIA–28 is authorized, I reject this contention.

12. *In re FTC Corporate Patterns Report Litigation,* 432 F.Supp. 291, 307–308 (D.D.C.1977).

13. *A. O. Smith Corp. v. FTC,* 396 F.Supp. 1125, 1132 (D.Del.1975).

14. 432 F.Supp. at 307–308.

Moreover, since plaintiffs are among those required to respond to EIA–28 and, therefore, to shoulder whatever burden is associated with it, I conclude that they have a sufficient stake to satisfy Article III's case or controversy requirements and that they are "adversely affected" parties entitled to judicial review under the APA. 5 U.S.C. § 702.[15]

### B. *The Merits.*

### 1. *The clearance authority of the OMB.*

■ Prior to 1973, the OMB was required to review all information-collection proposals which were subject to the Federal Reports Act. In that year, however, an amendment was passed vesting clearance authority in the Comptroller General with respect to information solicitations by "independent Federal regulatory agencies". 44 U.S.C. §§ 3509, 3512 (1969 and 1979 Supp.). The amendment fails to define that phrase. However, the Conference Report, while also failing to define the term, indicates that the purpose of the change was "to preserve the independence of the regulatory agencies to carry out the quasi-judicial functions which have been entrusted to them by the Congress." H.Rep.93–624, 93rd Cong., 1st Sess. (1973), *reprinted in* [1973] U.S.Code Cong. and Admin.News pp. 2417, 2533. Accordingly, the Conference Report's nonexhaustive listing of agencies deemed by Congress to be "independent Federal regulatory agencies" includes only regulatory agencies with quasi-judicial functions. *Id.* at 2534.

The DOE Act vests the EIA Administrator with considerable independence in connection with the collection, analysis and publication of information.[16] It does not, however, confer upon the EIA any regula-

tory or quasi-judicial authority; nor does any other statutory provision or statement in legislative history. Accordingly, I conclude that clearance authority with respect to EIA information demands did not pass to the Comptroller General in 1973 and thus remains with the OMB.

### 2. *The decision of the OMB Director.*

■ The decision of the OMB Director, as reflected in his clearance letter,[17] applies the applicable legal standards and clearly has a rational basis. Thus, it is difficult to understand plaintiffs' attack. Their first argument is that the OMB Director violated his duty under the Federal Reports Act to minimize burden and duplication by conditionally approving the FRS even though he found that "it will be burdensome for respondents and costly for the government when fully implemented." A.R., Vol. I at 255. This argument ignores the fact that the Act does not require the Director to *eliminate* burden and cost, but only to *minimize* them. The administrative record evidences that the Director complied with these policies in granting conditional approval of the FRS. He found, specifically, that the EIA had expended "substantial effort and reasonable care devoted to holding down burden and cost." *Ibid.* He advised, however, that implementation of the FRS must be "monitored closely to ensure that burden and cost are truly minimized," directed the DOE to identify existing reporting requirements made unnecessary by implementation of the FRS, and withheld approval of particular data-element requests so as to reduce the reporting burden. *Id.* at 255–261. In short, the record shows that the Director gave careful consideration to burden and duplication, as he was required to do under the FRS, and that he did

---

**15.** The availability of review under the APA makes it unnecessary to consider whether a private right of action exists under the Federal Reports Act. *See Chrysler v. Brown,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979).

**16.** Section 205(d) of the DOE Act, 42 U.S.C. § 7135(d), cited by plaintiffs, provides as follows:

> The Administrator [of the EIA] shall not be required to obtain the approval of any other

officer or employee of the Department [of Energy] in connection with the collection or analysis of any information; nor shall the Administrator be required, prior to publication, to obtain the approval of any other officer or employee of the United States with respect to the substance of any statistical or forecasting technical reports which he has prepared in accordance with law.

**17.** A.R., Vol. I at 255.

not approve the FRS until satisfied that "the need for the information warrants the burden and cost involved." *Id.* at 255.

The plaintiffs' second argument is more difficult to follow. They assert, as I understand it, that the clearance was improper because the Director made his determination that the need for the information warranted the cost and burden involved without considering the value of the sought information for antitrust enforcement purposes. It is clear from the Director's certification letter that he did not consider the EIA determination to share data with the FTC and DOJ and accordingly, that he did not consider any possible value of the information to those agencies for antitrust purposes. But if the Director determined that the needs of the EIA for the information justified the cost and burden, it would hardly seem significant that possible value to other agencies was not taken into account.

Finally, plaintiffs criticize the OMB Director for failing to insist on an EIA determination, in accordance with OMB Circular No. A–40, as to "whether all of the items of information to be furnished . . . are essential to the central purpose of . . . such report form." The short answer is that the EIA did make and submit such a determination and the plaintiffs' refusal to recognize it as such is based on their erroneous view that "antitrust information" has no relevance to planning and policy making.

### 3. *Congressional influence.*

Finally, plaintiffs urge me to nullify the OMB's approval of the FRS because, they say, that decision was "tainted" by the improper influence of members of Congress. In particular, they point to two letters, the former signed by Representative Morris Udall and Senators Edward Kennedy and Floyd Haskell, and the latter signed by Representative John Dingell, sent to the Director in the Summer of 1978. Both urge that the OMB act quickly in deciding whether to approve the FRS. Congressman Dingell's letter states, additionally, his view that the Director's review of a statutorily mandated information report under the Federal Reports Act can only be *"pro for-*

*ma",* and that the OMB is not authorized to condition approval of the FRS on the EIA's agreement not to provide the information obtained to other federal agencies. Plaintiffs contend that this interference with the OMB's clearance decision was pervasive and can only be remedied by setting that decision aside. Defendants respond that the influence was of neither the kind nor the magnitude required to warrant nullification of the clearance decision.

The Third Circuit Court of Appeals addressed the question of undue congressional influence on administrative decisionmaking in *Gulf Oil Corp. v. FPC*, 563 F.2d 588 (3 Cir. 1977). In that case two subcommittees in the House of Representatives had convened hearings to determine why the Federal Power Commission had decided to conduct a lengthy show cause hearing rather than seek an immediate injunction. The Court held that the plaintiffs had failed to make the requisite showing of undue influence, citing three factors. First, it noted that the subcommittees' inquiry had concerned a matter of law and had not involved pressure with respect to a determination of disputed matters of fact. The Court observed that "A point of view—even bias induced by legislative interference—as to questions of law . . . does not necessarily render invalid an agency's decision" because "judicial review is fully capable of correcting bias as to legal questions". *Id.* at 612. The Court further concluded the influence complained of in *Gulf* did not require it to set aside the agency's action because the influence had been directed not to the merits of the adjudication, but merely to acceleration of the disposition and enforcement of the FPC's procedures. *Id.* at 611. Third, the Court refused to overturn the agency's action because there had been no showing that whatever influence may have been exerted had had any effect. *Id.* at 612.

 These principles control here. For the most part the letters in issue merely urged the OMB to accelerate its review procedure. While Congressman Dingell did indicate his views on the applicable scope of

review and the impropriety of approval conditioned on an agreement regarding confidentiality, these represented merely his views on matters of law, rather than an attempt to coerce a prejudgment of questions of fact then pending before the OMB. Finally, plaintiffs have come forward with no evidence suggesting that the influence purportedly exerted by members of Congress upon the OMB clearance review process had any effect whatever.[18] On the contrary, the record reveals that the OMB carefully evaluated the FRS report for some four months, did not clear the report until satisfied that it accorded with the congressional policies announced in the Federal Reports Act and ultimately granted only conditional clearance. Thus, I conclude that the influence exerted by members of Congress was not improper and that, in any event, it had no effect on the OMB clearance review process.[19]

## V. INTER–AGENCY DISCLOSURE

### A. *Reviewability.*

Plaintiffs assert that the EIA's decision, reflected in its "Guidelines", to disclose confidential FRS data to the DOJ, the FTC, the Secretary of the Interior and the Comptroller General is final agency action which adversely affects them, that they are accordingly entitled to judicial review of that decision under the APA, and that they are entitled to relief because that decision is "not in accordance with law". 5 U.S.C. § 706.

Defendants respond, once again, that the issues raised by plaintiffs are not ripe for decision. The argument has two aspects. First, defendants say that no final decision has been made by the EIA regarding a specific disclosure and that no justiciable issue will be presented until a decision is made by that agency on a specific request from another agency. Second, they assert that some of plaintiffs' claims "focus on hypothetical proceedings involving the reporting companies, and that, at least as to these issues, plaintiffs must wait until such time, if ever, as an agency receiving FRS data threatens to use it in a way which plaintiffs claim to be improper". The latter argument has merit; the former is unpersuasive.

■ The present record demonstrates beyond peradventure that the EIA's decision to disclose confidential FRS data to the agencies named in its guidelines is a final one which will not be reviewed when specific requests are received and that requests from at least the DOJ and FTC are both inevitable and imminent. The EIA published its guidelines in the Federal Register and its Administrator has made it clear that disclosure with appropriate safeguards is the established policy of his agency. Any further proceedings by the agency when the requests are made will be limited to a determination of whether the requesting agency has satisfied the guidelines. On these facts, plaintiffs' primary argument that disclosure by the EIA to other agencies is barred by law presents solely a question of law which is as concrete as it will ever become.

---

**18.** *D.C. Federation of Civic Associations v. Volpe,* 148 U.S.App.D.C. 207, 459 F.2d 1231 (D.C.Cir. 1972), is, therefore, inapposite. In that case the Court stated that under the "controlling principle of law" a showing that the challenged decision was "based in whole or in part on the [improper congressional] pressures" must be made. *Id.* 148 U.S.App.D.C. at 222, 459 F.2d at 1246.

**19.** Plaintiffs also make the separate but related claim that the OMB's clearance decision should be vacated because undue influence was exerted on it by other federal agencies, particularly the DOJ, FTC and DOE. While the OMB did receive letters from each of these agencies urging speedy action in approving the FRS report, any influence which they exerted cannot be described as either improper or undue. Those agencies had a legitimate interest in EIA–28, and it was no more inappropriate to have their views before the Director than it was to have the views of the EIA before him. Moreover, given the desirability of having the comments of interested agencies and the remoteness of the possibility that agency action be improperly influenced by pressure from an entity having no purse strings control or other leverage over the decisionmaker, I believe a court should be slow to apply the improper influence doctrine in an inter-agency context.

As indicated in Section III, *supra,* I do, however, agree with defendants that, to the extent plaintiffs' claims turn on the possible improper use of FRS data by receiving agencies in litigation or agency proceedings, not yet initiated, the challenge must await specific action by those agencies. *In re FTC Corporate Patterns Report Litigation,* 432 F.Supp. 291, 313 (D.D.C. 1977), *aff'd,* 193 U.S.App.D.C. 300, 595 F.2d 685 (D.C.Cir. 1978).

### B. *The Merits.*

The linchpin of plaintiffs' argument is that the Trade Secrets Act, expressly made applicable to FRS data by Section 205(h)(7) of the DOE Act, makes it illegal for the EIA to disclose confidential data to anyone beyond the DOE, whether within the federal government or without. The first issue this raises is whether the Trade Secrets Act applies to disclosures to another federal agency rather than to the public. Read literally, it applies to such inter-agency transfers and, as noted above, no court appears to have held it inapplicable in that context. Moreover, when Congress was fashioning its rules with respect to energy information over the last five years, it appears to have interpreted the Trade Secrets Act as foreclosing inter-agency transfers of confidential information unless they are otherwise authorized. Thus, in both the ESECA and the NERDA, Congress made the Trade Secrets Act applicable to energy data gathered under those Acts and then expressly excepted specified inter-agency transfers. For this reason I will assume, without deciding, that the Trade Secrets Act applies to inter-agency disclosures.

The Trade Secrets Act does not forbid all inter-agency disclosure, however. It bars only disclosures which are "not authorized by law" and the ultimate issue to be resolved is thus whether the EIA is authorized by law to make disclosure of confidential FRS data to the DOJ and the FTC. The defendants do not rely on their guidelines as *authority* for such disclosures so we must look to the provisions of other federal statutes for that authority, and the issues raised in *Chrysler v. Brown,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), need not concern us.

As the plaintiffs concede, the Federal Reports Act establishes standards for certain inter-agency disclosures of confidential data. While plaintiffs argue to the contrary, it is clear that disclosure of the FRS data at stake in this case was not declared confidential by the EIA prior to the time for collection [20] and, accordingly, the Federal Reports Act does not prohibit disclosure. Indeed, one can argue with some force that this Act affirmatively authorizes the disclosure of confidential FRS data not declared confidential at the time of collection and, accordingly, renders the Trade Secrets Act inapplicable.[21] The Federal Reports Act is applicable to FRS information and would appear to dictate that such data be shared by all federal agencies, subject to the Act's restrictions regarding confidential data, in order to avoid burden to the private sector and save expense in the public sector. I find it unnecessary, however, to rule upon the relationship between the Federal Reports Act and the Trade Secrets Act. In the field of energy information I believe Congress has specifically, albeit somewhat asymmetrically, articu-

---

**20.** Plaintiffs cite several pages of the Federal Register for the proposition that the EIA has acknowledged the confidentiality of the data, but the pages cited, while recognizing that some of the data to be submitted may be confidential, expressly reserve a determination of the confidentiality of particular information. 42 Fed.Reg. 35188 (July 8, 1977); 44 Fed.Reg. 2760 (January 12, 1979).

**21.** The argument is stronger with respect to the proposed disclosures to the DOJ than with respect to the proposed disclosures to the FTC.

Section 3508(b), which specifically addresses confidential disclosure, speaks of disclosures by a "Federal agency" to another "Federal agency", and, as earlier noted, the 1973 amendment to the Act excluded "independent Federal regulatory agencies" from the definition of "Federal agency". Accordingly, while Section 3508(b), on its face, is applicable to inter-agency disclosure between the EIA and the DOJ, it is not applicable to inter-agency disclosure between the EIA and the FTC.

lated its intent with respect to inter-agency disclosures and I conclude that the provisions of its energy legislation should govern the question before me.

When Congress passed the DOE Act and mandated the FRS program, it did not see itself as conferring new authority with respect to the collection, analysis and dissemination of energy information. What it intended was, first, a still greater degree of centralization with respect to these functions than existed after the creation of the National Energy Information System and, second, an express directive that needed energy data, which the FEA had had the authority to obtain earlier but had not, be obtained. The House Committee, for example, commented with respect to the provision mandating an FRS program:

> . . . This provision neither expands nor limits the basic authority of the Federal Government to gather energy information; however, it does represent a new requirement that certain information—relating, for example, to the costs, profits, cash flow, and investments undertaken in the functional segments of integrated energy companies—be collected on a systematic basis from major energy producing companies. Previous discretionary authority to collect this sort of information has not been used by the Federal Energy Administration.

S.Rep.No.164, 95th Cong., 1st Sess. 51, *reprinted in* [1977] U.S.Code Cong. & Admin. News pp. 854, 905.

The legislative history also reveals that the authority to disclose, like the authority to acquire, was to remain basically unchanged. The reference to the Trade Secrets Act at the end of the FRS provisions was viewed as comparable to the protection afforded proprietary data in earlier energy legislation and it was understood that "Existing law regarding the protection of confidential, proprietary information would not be changed." *Id.* at 905. With respect to the provisions of the Act continuing the express authority for inter-agency disclosures of information obtained under the ESECA and NERDA, 42 U.S.C. § 7135(g),

the Conference Report makes it clear that no change with respect to existing disclosure rules was intended:

> The conferees do not intend references to these statutory provisions to be exclusive requirements of law governing confidentiality of data acquired by the Administrator, and other applicable law relevant to information acquired by the Administrator under different authority would continue to apply in the same manner as before transfer of these authorities to the Department of Energy.

H.R.Conf.Rep.No.539, 95th Cong., 1st Sess. 60, *reprinted in* [1977] U.S.Code Cong. & Admin.News pp. 925, 930. It would thus appear that the answer to the pending question is to be found in the energy legislation which originally created the energy data authority consolidated in the Secretary and the EIA by the DOE Act.

I first turn to the FEA Act. Under that Act, the Administrator was not only given comprehensive authority to obtain all information relevant to his functions under that Act, but he was also directed to establish and maintain a "National Energy Information System" which would supply the energy informational needs of Congress as well as of all "officers and employees of the United States [who] . . . [had] been delegated, energy-related policy decision-making responsibilities." 15 U.S.C. § 790a. It will be recalled that the Administrator was also directed to further the congressionally mandated goals of avoiding duplication of effort by governmental agencies in the energy data field and of minimizing the compliance burden on business enterprises and other persons required to supply such data.

Given the purpose of the National Energy Information System and the express declaration of a policy favoring agency cooperation with respect to energy data, it is difficult to argue that Congress did not contemplate disclosure of energy information by the Administrator at least to those other federal agencies who are vested with policy making responsibility in the energy area. It would, of course, be pointless for

the Administrator to collect and analyze energy data necessary to another agency's function if disclosure of that information to the other agency was to be foreclosed. It is far more reasonable to assume that Congress anticipated inter-agency transfers of energy data and that where the data pertinent to the other agency's functions included proprietary information, as Congress was aware it frequently would, the transfers would include such data.

That Congress contemplated such dissemination is in no way inconsistent with its references, in the FEA Act and the legislative proceedings thereon, to the Trade Secrets Act and the importance of protecting proprietary information. The Trade Secrets Act had been enacted decades earlier. Its purpose, and the apparent purpose of its incorporation in the FEA Act, is preservation of the commercial value of trade secret and proprietary information. That value is put at risk only by disclosures to the public and by other disclosures which may result in its eventual use in the marketplace. When Congress fashioned the FEA it was aware that information confidential in the hands of one agency would, upon transfer to another agency, remain confidential in the hands of the receiving agency. Thus, the Conference Report relating to the creation of the Office of Energy Information and Analysis, for example, reflects that the conferees expected any "sensitive and confidential information" supplied to that Office by another federal agency would "be afforded the protection which such information would have received" in the agency supplying it.[22] Indeed, this result is mandated by the Federal Reports Act. 44 U.S.C. § 3508(a). Given this restriction on retransfer, there simply was no reason for Congress to sacrifice the efficiency provided by affording other agencies access to the National Energy Information System in order to protect the commercial value of trade secret and proprietary data.

 The provisions of the FEA Act and the other energy legislation incorporated into the DOE Act are consistent with these views of the congressional intent. Section 12 of the FEA Act requires that proprietary information obtained under the Act be protected, but expressly authorizes the Administrator or the Comptroller General to disclose such information to other federal government departments and agencies for their official use as long as it is done "in a manner designed to preserve its confidentiality". 15 U.S.C. § 771(f). The plaintiffs suggest that this authority not be given its literal scope but rather that its application be limited, insofar as the Administrator is concerned, to information obtained by him from the Comptroller General. While the piece of legislative history they cite does support this view,[23] the wording of the subsection and its context will not permit this construction. Neither the wording of this authorization nor the section in which it is found refers to information obtained by the Administrator from the Comptroller General. Section 12 speaks only of the Comptroller General's access to all data obtained by the Administrator under the Act and of the Comptroller General's authority for obtaining information from other sources to enable him to monitor the Administrator's performance of his statutory function.

---

22. S.Conf.Rep.No.1119, 94th Cong., 2d Sess. 78, *reprinted in* [1976] U.S.Code Cong. & Admin.News pp. 2027, 2054.

23. *See* S.Conf.Rep.No.788, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin. News, pp. 2972, 2978:

 The Conference substitute also incorporates a provision in the House bill (section 14(b)) reiterating the prohibition in 18 U.S.C. 1905 against disclosure to the public of trade secrets and other confidential data but making such information available by the Comptroller General or the Administrator to Congress, courts and Federal agencies for official use. The Senate amendment (section 119(e)) contained a comparable provision, but it did not specifically provide that confidential information could be disclosed to Congress, courts, or agencies.

 The provisions for disclosure by the Administrator contained in section 12(f) refer only to information received from the Comptroller General under section 12. Disclosure of information obtained by the Administrator from other sources is subject to section 14 of the conference substitute.

Thus, in context, both Section 12's protection against public disclosure and its authority for confidential, inter-agency disclosure apply to information secured originally by the Administrator as well as information secured by the Comptroller General.

■ More important, however, the Act must be construed as a whole in a manner which produces a rational scheme. Plaintiffs have suggested no reason why Congress might wish to distinguish inter-agency disclosure purposes, between information obtained by the Administrator and information of a similar character obtained by the Comptroller, much less why it might wish to authorize the Comptroller to disclose all FEA energy data to other federal agencies on a confidential basis and yet deny that authority to the FEA Administrator. In the absence of a satisfactory rationale for implying an unstated limitation on the provisions of Section 12, I am constrained to follow its literal meaning.

■ Contrary to plaintiffs' contention, Section 14 of the FEA Act, 15 U.S.C. § 773, does not limit the authority of the Administrator to share energy information with other federal agencies. That section deals solely with the subject of public disclosure and is clearly a grant of authority rather than a restriction. Section 14(b), upon which plaintiffs place primary reliance, provides generally that the FOIA shall apply to "public disclosures" of information by the Administrator. It goes on, however, to carve out two exceptions or "provisos" from the general rule. The exception relevant here is the "proviso" that, notwithstanding the FOIA and the Trade Secrets Act, trade secret and proprietary data "may be disclosed to other persons authorized to perform functions under this [Act] solely to carry out the purposes of the [Act]." In short, the Administrator is authorized to make disclosure to anyone, in or out of the government, where that disclosure is necessary to the carrying out of the

Act and no restrictions on public disclosure are to interfere with that necessary function. Thus, for example, if the Administrator engages the services of a consultant pursuant to Section 7 of the Act, 15 U.S.C. § 766, he may disclose confidential data to him with the understanding that it is to be used solely for the purposes of his engagement by the Administrator.

■ Nor do I find that the inclusion in the ESECA and NERDA of explicit authority for inter-agency disclosure to four named agencies is a significant aid in construing the authority vested in the Secretary and the EIA Administrator by the DOE Act. As earlier noted, the legislative history of that Act indicates that its reference to the ESECA and NERDA disclosure provisions was not intended to raise any inference, negative or otherwise, about the authority of the Secretary or the EIA under earlier acts. Similarly, Congress expressly stated in the ESECA that the authority conferred with respect to energy data was "not in limitation of, any other authority of the Federal Energy Administrator" under earlier legislation such as the FEA Act. 15 U.S.C. § 796(g).

Plaintiffs' argument in favor of drawing a negative inference from the ESECA and NERDA disclosure provisions, however, fails primarily for want of a rationale. Although the EIA Administrator's power to collect information under the ESECA is extremely broad, plaintiffs concede that he is authorized to disseminate such information to other federal agencies. Under the FEA Act the EIA Administrator is empowered to collect precisely the same kinds of energy information, but plaintiffs contend that he is unable to disclose this information to other federal agencies. I have found nothing in these two Acts or their legislative histories which would explain why Congress might have intended such an anomalous result.[24] Accordingly, I decline to draw the

---

**24.** It is true, as plaintiffs point out, that the EIA promulgated its FRS form under FEA and DOE Act authority rather than ESECA authority and that, arguably, a rulemaking proceeding may

have been required to adopt it under the ESE-CA. But this difference in procedure, absent *some difference in the kind of data involved*, does not seem to me significant in the context

negative inference for which plaintiffs contend.

■ In summary, I conclude that the EIA, by virtue of delegated authority originally conferred in the FEA Act, is authorized to disclose energy information, including proprietary data, to any federal agency vested with energy-related policy decision-making responsibilities (15 U.S.C. § 790), as well as to any other federal agency which has a legitimate need for that information in the exercise of its official responsibilities (15 U.S.C. § 771(f)). Since the DOJ [25] and the FTC [26] are such agencies, the EIA is authorized to disclose FRS data to them.

Supplementary to their primary argument that the EIA has no statutory authority for inter-agency disclosures and that such disclosures, accordingly, violate the Trade Secrets Act, plaintiffs also assert that the particular decision to disclose FRS data and the "Guidelines" for implementing that decision are infirm for three additional reasons.

■ First, plaintiffs maintain that the decision to disclose FRS data violated a section of the DOE Act which decrees that an exercise of the authority of the EIA Administrator in connection with the collection or analysis of information shall not require the approval of any other official of the DOE. 42 U.S.C. § 7135(d).[27] The predicate for this argument is a claim that Dr.

Lincoln Moses, Director of the EIA, initially favored a policy of maintaining the confidentiality of certain proprietary data and that he "abdicated his statutory responsibility" in April of 1978 when he complied with the "command" of Secretary Schlesinger to adopt a policy of inter-agency disclosure.

The record does not reveal any participation by Secretary Schlesinger in the decision regarding the treatment to be given FRS data. The events of April 10, 1978, related not to the EIA policy with respect to disclosure of FRS data, but to the DOE's general disclosure policy. The record shows, further, that the EIA made its FRS disclosure decision independently. Moreover, even if the evidence supported plaintiffs' factual contentions, I would be unable to agree that Secretary Schlesinger's participation violated the DOE Act. The Section of the Act on which plaintiffs rely deals not with disclosure, but with collection and analysis of data and states not that the EIA Administrator is *prohibited* from obtaining prior approval of his data collection and analysis activities, but only that he is not *"required"* to do so.

■ Next, plaintiffs allege that the decision to disclose FRS data was the product of undue influence from Congress, the DOJ and the FTC. As far as congressional influence is concerned, plaintiffs rely on four

---

of a Congressional decision on the desirability of confidential, inter-agency disclosures.

**25.** The DOJ is vested with a number of energy-related responsibilities. Under 43 U.S.C. § 1337(c) (Supp.1979), the Attorney General is authorized to review lease sales in the petroleum industry. Additionally, he is required, under 30 U.S.C. § 208–2 (Supp.1979) to report to Congress on "competition in the coal and energy industries". The Attorney General is also required to assist the Secretary of the Interior in ensuring that no coal lease issuances or renewals violate the antitrust laws. Finally, under the Interstate Compact to Conserve Oil and Gas, P.L. 94–493, 90 Stat. 2365 (1976), the Attorney General is authorized to report to Congress on whether the actions of the states engaged in the Compact are consistent with the antitrust laws.

**26.** Congress has delegated specific energy-related duties to the FTC under the Deepwater Port Act of 1974, *see* 33 U.S.C. § 1506, the Energy Policy and Conservation Act of 1975, *see* 42 U.S.C. § 6291, *et seq.,* and the FEA Authorization Act of 1977, *see* 15 U.S.C. § 788. These statutes aside, however, there can be no doubt that the FTC has a legitimate need for FRS data in the exercise of its official responsibilities. Under Sections 5 and 6 of the FTC Act, 15 U.S.C. §§ 45, 46, it is mandated to prevent \unfair methods of competition, as well as to investigate, gather information and make reports concerning the competitive nature of business. These responsibilities require the Commission to concern itself with antitrust problems in the energy industry.

**27.** This Section is quoted in full, *supra,* at page 429, n. 16.

letters written by six members of Congress to either the Secretary or Deputy Secretary of Energy [28] concerning the DOE's policy on disclosure of confidential information. With respect to influence from the DOJ and FTC, plaintiffs point to a number of contacts between officials of those agencies and officials of the DOE in the course of which the DOE was urged to adopt a liberal disclosure policy.

No inference of improper influence can be drawn from the congressional letters. First, each of them discusses the legal aspects of disclosure rather than attempting to introduce factual bias into the disclosure decision. Second, the letters concern DOE disclosure policy in general and not one so much as mentions the FRS. Third, there is no evidence that any of them even found their way to the Director of the EIA who made the FRS disclosure decision.

With respect to the evidence of interagency contacts, I find nothing improper or surprising about two agencies expressing their views to a third on whether they should share data. As previously noted, Congress clearly wished such exchanges to occur.

 Finally, plaintiffs seek to enjoin disclosure to the DOJ and FTC on the ground that the development and approval of the guidelines for disclosure were rulemaking and that the EIA did not follow the rulemaking procedures mandated by Section 553 of the APA. The short answer is that the guidelines come within Section 553's exception for "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A).

This exception to the notice and opportunity for comment requirements of Section 553 applies when the proposed rule has no "substantive impact on the rights and duties of the person subject to regulation. *Reynolds Metals Co. v. Rumsfeld,* 564 F.2d 663, 669 (4 Cir. 1977). *See also Texaco, Inc. v. Federal Power Commission,* 412 F.2d 740 (3 Cir. 1969). Here the proposed agency action had the effect solely of establishing guidelines to be applied by the agency in determining whether and how to share its information with other government agencies. Those guidelines require nothing of plaintiffs or other regulated entities and do not alter their rights or duties in any way. It follows that the hearing and comment provisions of Section 553 were not applicable.[29]

## VI. CONCLUSION.

For the foregoing reasons, the defendants' motion for summary judgment will be granted and the plaintiffs' motion for summary judgment will be denied.

---

**28.** Two letters, one sent to Secretary Schlesinger, the other to Deputy Secretary O'Leary, were written by Congressman Dingell. A third was written by Senator Kennedy and sent to Schlesinger. A fourth was sent to the Secretary by Congressmen Udall, Moffett and Maguire.

**29.** The same conclusion was reached in a closely analogous context in *Reynolds Metals Co. v. Rumsfeld,* 417 F.Supp. 365 (E.D.Va.1976). The plaintiff there challenged an agreement between the Equal Employment Opportunity Commission and the Office of Federal Contract Compliance to exchange information concerning employer's compliance with anti-discrimination laws, including information submitted by regulated companies. The court held that the agreement was a "rule" as defined by the APA but that notice and opportunity for comment were not required under Section 553 because it had no substantive impact on those supplying the data to be exchanged. The Court of Appeals for the Fourth Circuit subsequently affirmed and adopted the District Court's reasoning.